Exhibit 1

**Terrordome Music Publishing, LLC.**
c/o Reach Global, Inc.
445 Park Avenue, 9th Floor
New York, NY 10022

AGREEMENT made as of this 22nd day of October 2001, by and between Terrordome Music Publishing, LLC, 445 Park Avenue, New York, New York 10022 ("Publisher") and Bring The Noize Music, Inc. ("Company").

WHEREAS, Publisher is engaged in the music publishing business and wishes to publish and administer certain musical compositions owned or controlled by Company on the terms and conditions contained herein; and

WHEREAS, Company wishes to have Publisher publish and administer such musical compositions on such terms and conditions.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, it is agreed as follows:

1)   As of the date hereof, Company hereby irrevocably and absolutely assigns, conveys and sets over unto Publisher, its affiliates, successors and assigns for the full term of the copyright and any extensions, renewals, restorations and revised terms thereof (the "Term"):

(i)      an undivided one-hundred (100%) percent interest in all worldwide right, title, interest, and ownership of every nature, kind and description in and to Company's share of all songs commercially released prior to the date of this agreement, including those songs listed on the attached Schedule "A" (hereinafter referred to as the "Songs"), including all versions and derivative works of the Songs and all copyrights or income participation rights in such other versions or derivative works; all causes of action for infringement of the same, past present and future; all proprietary rights; and all other rights (existing, contingent, expectant or otherwise) whether now or hereafter known to with respect thereto; and all the results and proceeds from the foregoing accrued and unpaid and hereafter accruing; and

(ii)      sole and exclusive administration rights in and to the Songs and to collect all royalties and fees (including royalties and fees accrued, earned or payable prior to the date of this agreement) with respect thereto throughout the world. Without limiting the generality of the foregoing, Publisher shall have the sole and exclusive right to sell, lease, license, print, publish and otherwise dispose of any and all rights in the Songs, to execute in its own name any and all licenses and agreement whatsoever affecting or respecting the Songs or any interest therein, including, without limitation, licenses for mechanical, electrical, print or other reproduction, public performance, synchronization, audio-visual, internet uses, dramatizations, and

subpublication, in all media now known or hereafter devised throughout the world; and to administer all licenses and agreements heretofore made by or on behalf of the Company; and to collect, hold and distribute any sums realized therefrom. Without limiting the above, Publisher has the right to directly collect, register and index in its own name one-hundred (100%) percent of mechanical rights income and no less than fifty percent (50%) or six-twelfths (6/12) of performance rights income from the international rights societies on behalf of Company.

2)    Company will execute and deliver to Publisher such instruments of transfer and other documents regarding the rights of Publisher in the Songs as Publisher may reasonably request to carry out for the purposes of this agreement (including, without limitation, the Direction Letter and Assignment of Copyright annexed hereto), and with respect to each document that Company fails to sign and return to Publisher within 10 days after Publisher has submitted that document to Company, Publisher may sign that document in the name of Company and make appropriate disposition of that document.

3)    INTENTIONALLY DELETED

4)    (i)        In further consideration of this agreement, Publisher shall retain an amount equal to fifty (50%) percent of all gross sums generated by the Songs. Conditioned upon compliance by Company with the material terms, conditions, representations, warranties and agreements made by Company in this agreement, Publisher agrees to pay to Company, and Company agrees to accept in full payment, an amount equal to fifty (50%) percent of all gross sums earned by the exploitation of the rights granted under this agreement and actually received by Publisher in U.S. dollars in the U.S.A.

(ii)        Company's share of the gross sums are payable to Company after deducting:  (a) charges made by mechanical licensing societies and/or performing rights societies; (b) subpublishers' fees and/or foreign collection commissions (c) any income or other tax (including withholding taxes and V.A.T.) as required by the taxing authorities in each country; (d) foreign exchange fees and international bank wire transfer fees; (e) copyright registration fees; and (f) an administration fee of ten (10%) percent.

(iii)       (a)  With respect to performance income (it being understood that only the composers and authors (the "Writers") of the Songs shall collect and be entitled to retain 100% of their so-called writer's share of performance income directly), Publisher shall retain one-hundred (100%) percent of all sums (i.e., so called "Publisher's Share") earned in lieu of the provisions set forth in paragraph 4(i) above. If Publisher collects the writer's share of performance income, Reach shall forward the writer's share to Writers without any deduction.

2

(b)   If Writers are not writer members in good standing at ASCAP, BMI or SESAC, or if Writers are un- represented by a performance rights society in any territory of the world, Writer hereby authorizes Publisher to index the applicable Songs and to collect performance royalties solely in the name of Reach, subject to the payment of royalties pursuant to paragraph 4(iii)(a).

(iv)  INTENTIONALLY DELETED

5)   If Company receives any royalties or other compensation of any kind with respect to the Songs (excluding the so-called writer's share of performance income) from any source other than Publisher during the Term, Company agrees to pay over to Publisher all such sums, together with any accounting statement. If Company does not pay over to Publisher such sums, Publisher can deduct these sums from the payment of royalties to Company.

6)   (i)  Publisher shall keep true and correct accounts, books and records. Royalty statements and payments made by Publisher to Company shall be made within ninety (90) days after the end of each semi-annual accounting period ending December 31st and June 30th. Company warrants and represents that all royalties due Writers with respect to the Songs through the date hereof have been paid in full. Upon written notice by Company, Publisher shall account and pay royalties directly to the Writers from the share of royalties due to Company. In lieu of written instructions, Company is responsible for accounting and paying the Writers.

(ii) Each accounting and payment, in the absence of written objection thereto, shall become final within two (2) years of the rendering of each such royalty statement. A certified public accountant on Company's behalf shall have the right to audit our books and records as to each statement within the two year time period as stated in the preceding sentence. Company shall be entitled to conduct such an examination not more than once during any calendar year and not more than once as to any single statement.   Such examination shall take place at Publisher's place of business during normal business hours upon thirty (30) days prior written notice to Publisher. Company shall be foreclosed from maintaining any action, claim or proceeding relating to any accounting rendered hereunder unless it is commenced against Publisher in a court of competent jurisdiction within two (2) years after the date Company has delivered its written objection to Publisher hereunder.

7)   Company warrants and represents that it has caused the Writers to execute valid and binding exclusive songwriter agreements, the term of which exclusive songwriter agreements are for at least as long as the term hereof.  Company shall provide

3

Publisher with copies of such agreements upon demand therefore by Publisher. Company shall not, during the term hereof, modify, amend nor breach such exclusive songwriter agreements nor release Writers or any of them from such exclusive songwriter agreements without the approval of Publisher in writing.  Company represents, warrants and covenants that it will enforce all rights acquired by it pursuant to such exclusive songwriter agreements between it and the Writers.  In the event of Company's failure or refusal to enforce such agreements, Publisher shall have, and Company hereby assigns to Publisher, the right to enforce such exclusive songwriter agreements in the place and stead of Company for the benefit of Company and Publisher as their interests may appear.

8)    (i)   Company warrants and represents that it controls no less than the percentages listed on the attached Schedule "A".

(ii)      If, after signature of this agreement, it is determined that Company controls less than the Song percentages listed on the attached Schedule "A", then Publisher shall be "made whole" of this diminution by increasing its copyright ownership and the share it retains from the gross sums payable to Company, in order to equal the original ownership and sums Publisher would have earned if the original percentage splits in Schedule "A" would have been adhered to.

9)    INTENTIONALLY DELETED

10)   Company hereby grants Publisher the right to use the names (including any professional or fictitious names) heretofore and hereafter adopted by the Company or Writers, likenesses and biographical information concerning the Company or Writers for the purposes of advertising, promotion and trade.

11)   This Agreement; which shall be binding upon Company's respective parents, affiliates, successors and assigns; is the entire agreement between the parties with respect to the subject matter hereof and shall not be modified, except by an instrument in writing, signed by each of the parties. The parties hereto are independent contractors and nothing contained herein shall be construed a joint venture or partnership between the parties.

12)   In the event that Publisher enters into any suit or proceeding to protect or enforce the rights granted to it hereunder, and in the event of any recovery therefrom, the proceeds thereof, after deduction from the gross amount thereof of all direct, out-of-pocket expenses of litigation (including, but not limited to, reasonable outside attorneys' fees, legal expenses and court costs) shall be divided between Publisher and Company in the same percentages as provided in paragraph 4 of this agreement.

4

13)    Pursuant to a co-publishing/co-administration agreement
as of August 1992, by and between Def Jam Music, Inc. and Bring
The Noize Music, Inc., Company warrants and represents that it has
the full right, power and authority to enter into this agreement
and to grant Publisher the rights herein granted. Furthermore,
Company warrants and represents (i) that each of the Songs shall
be original and shall not infringe upon any other work; (ii) the
exercise by Publisher of any and all of the rights granted to
Publisher in this agreement will not violate or infringe upon any
common law or statutory rights of any person or entity,
including, without limitation contractual rights, copyrights, and
rights of privacy; (iii) that the rights granted herein are free
and clear of any unrecouped advances, claims, demands, actions,
liens or encumbrances; (iv) that there are no suits, claims
actions or other legal or administrative proceedings involving
Company, the Writers, or the Songs, now pending or treated, nor
is there any basis therefore; and (v) there are no existing
administration, publishing or subpublishing agreements that are
currently in effect with respect to the Songs.

14)    Company agrees to and does hereby indemnify, save and
hold Publisher harmless from and against any and all loss and
damage (including, without limitation, reasonable attorneys' fees
and legal costs) arising out of or connected with the Songs or
any claim which is inconsistent with any of the warranties,
representations, covenants or agreements made by Company in this
agreement. Company agrees to reimburse Publisher on demand for
any payments made by Publisher at any time after the date hereof
and for any loss or damage of any kind or nature incurred by
Publisher with respect to any liability or claim to which the
foregoing indemnity relates.  Pending the determination of any
such claim, Publisher may withhold the payment of royalties,
including, without limitation, any Writer's share of royalties to
the extent that the Writer is the writer of a Song subject to
this indemnity or in the event the Writer or a person or entity
owned or controlled by the Writer or an affiliate thereof is a
member of Company, in an amount reasonably related to potential
liability of Company under this indemnity, including direct, out-
of-pocket legal costs expended by Publisher. Publisher shall give
Company notice of any such claim to which the foregoing indemnity
applies and Company shall have the right to participate in the
defense thereof, at its sole costs and expense, provided, that
Publisher shall retain control of such defense.

15)    Company agrees that in the event, in the opinion of
Company, Publisher has breached this agreement, Company shall
deliver to Publisher by registered mail, return receipt
requested, a written notice specifying all such alleged breach
and Publisher shall have sixty (60) days from the receipt by
Company of such written notice to substantially cure such alleged
breach.  Such alleged breach shall not be grounds for any action,
claim or proceeding, whether at law or in equity, with respect to
this agreement until the expiration of said sixty (60) day period

5

and unless during said sixty (60) day period Publisher has not substantially cured same.

16)   This agreement is being entered into and shall be construed in accordance with the laws of the State of New York as if it were entered into and wholly executed in the State of New York.   All judicial proceedings brought against a party with respect to this agreement or any related document may be brought in any state or federal court of competent jurisdiction in the County of New York in the State of New York and by its execution and delivery of this agreement, each of the parties accepts, for itself and in connection with its properties, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any final judgment rendered thereby in connection with this agreement or any of the other related documents from which no appeal has been taken or is available.   Each of the parties hereby irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by overnight courier, to its notice address hereunder, such service to become effective five (5) business days after such mailing or on the next business day if sent by overnight courier. Nothing herein shall affect the right to serve process in any other manner permitted by law.

17)   If in any jurisdiction, any provision of this agreement or its application to any party or circumstance is prohibited, unenforceable or otherwise restricted, such provision shall, as to such jurisdiction, be ineffective only to the extent of such restriction and without affecting the validity or enforceability of such provision in any other jurisdiction or its application to other parties or circumstances.   In addition, if any one or more of the provisions contained in this agreement shall for any reason in any jurisdiction be held to be excessively broad as to time, duration, scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law of such jurisdiction as it shall then appear.

**IN WITNESS WHEREOF**, the parties have executed this agreement as of the date first above written.

TERRORDOME MUSIC PUBLISHING, LLC          BRING THE NOIZE MUSIC, INC.

By:_____          By:_____
    Michael Closter                          Carlton Ridenhour

6

## DIRECTION LETTER

As of October 22, 2001

To:    All Record Manufacturers
Licensed to Mechanically
Reproduce Compositions

All Performing Rights Societies

All Other Parties of Interest:

Please be advised that Bring The Noize Music, Inc. has entered into an exclusive publishing and administration agreement with Terrordome Music Publishing, LLC., its affiliated companies, successors and assigns for the territory of the world with respect to the following compositions listed on the attached Schedule "A", that are written, owned and/or controlled, in whole or in part, by the undersigned, including any other versions, covers or derivative works thereof.

You are hereby authorized and directed to address all related correspondences, inquiries and royalty statements and payments (regardless of when earned) to:

TERRORDOME MUSIC PUBLISHING, LLC
c/o Reach Global, Inc.
445 Park Avenue, 9th Floor
New York, New York 10022
Attn: Michael Closter

Any such payments made by you pursuant to this authorization shall discharge you of any obligation to make any such payments to the undersigned.

Terrordome Music Publishing may now be listed on all licenses, statements and registrations, and replace Bring The Noize Music, Inc.

The foregoing authorization shall remain in full force and effect for the full term of copyright, including any extensions and renewals.

Sincerely,

Carlton Ridenhour
Bring The Noize Music, Inc.

## ASSIGNMENT OF COPYRIGHT

In consideration of the sum of one ($1.00) dollar and other good and valuable consideration, receipt of which is hereby acknowledged, Bring The Noize Music, Inc. hereby sells, assigns, transfers and sets over unto TERRORDOME MUSIC PUBLISHING, LLC., its affiliates, successors and assigns, an undivided one-hundred (100%) percent interest in all of the undersigned's right, title and interest of whatsoever kind or nature in and to the musical compositions listed on the attached Schedule "A", including, but not limited to, the undersigned's ownership of the copyright therein and all rights to and under the copyright for the full term of the copyright and any extensions, renewals or revised terms thereof in the United States and elsewhere throughout the world; all versions and derivative works of said composition and all copyrights in such other versions or derivative works; all causes of action for infringement of the same, past present and future; all proprietary rights; and all other rights (existing, contingent, expectant or otherwise) whether now or hereafter known to with respect thereto; and all the results and proceeds from the foregoing accrued and unpaid and hereafter accruing.

Bring The Noize Music, Inc. and Terrordome Music Publishing, LLC. have entered into a formal agreement, dated October 22, 2001 (the "Agreement") relating to the transfer of the foregoing rights, which rights are more fully described in the Agreement, and this instrument is expressly made subject to all of the terms, conditions and provisions contained in the Agreement.

If any provision of the assignment shall be held void, invalid or inoperative, no other provision of this instrument of transfer shall be affected as a result thereof and, accordingly; the remaining provisions of this instrument of transfer shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 22nd day of October 2001.

BRING THE NOIZE MUSIC, INC.

By:_____

Carlton Ridenhour

<u>Schedule "A"</u> (consisting of 2 pages below)                Page 1

Made part of the Assignment of Copyright and Direction Letter dated October 22, 2001 by and between

Bring the Noize Music, Inc. and Terrordome Music Publishing LLC

| SONGS (musical compositions) | ARTIST (first performed) | ALBUM (Primary Release) | Initial Year of Release |
|---|---|---|---|
| You're Gonna Get Yours | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Sophisticated Bitch | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Miuzi Weighs A Ton | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Timebomb | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Too Much Posse | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Righstarter (Message To A Black Man) | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Public Enemy No.1 | Public Enemy | Yo! Bum Rush the Show | 1987 |
| M.P.E. | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Yo! Bum Rush The Show | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Raise The Roof | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Megablast | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Terminator X Speaks With His Hands | Public Enemy | Yo! Bum Rush the Show | 1987 |
| Countdown To Armageddon | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Bring The Noise | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Don't Believe The Hype | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Cold Lampin With Flavor | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Terminator X To The Edge of Panic | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Mind Terrorist | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Louder Than A Bomb | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Caught, Can We Get A Witness | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Show 'Em Watcha Got | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| She Watch Channel Zero | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Night Of The Living Baseheads | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Black Steel In The Hour Of Chaos | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Security Of The First World | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Rebel Without A Pause | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Prophets Of Rage | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Party For Your Right To Fight | Public Enemy | It Takes a Nation of Millions to Hold Us Back | 1988 |
| Brothers Gonna Work It Out | Public Enemy | Fear of a Black Planet | 1990 |
| 911 Is A Joke | Public Enemy | Fear of a Black Planet | 1990 |
| Incident At 66.6 FM | Public Enemy | Fear of a Black Planet | 1990 |
| Welcome To The Terrordome | Public Enemy | Fear of a Black Planet | 1990 |
| Meet The G That Killed Me | Public Enemy | Fear of a Black Planet | 1990 |
| Pollywanacraka | Public Enemy | Fear of a Black Planet | 1990 |
| Anti-Nigger Machine | Public Enemy | Fear of a Black Planet | 1990 |
| Burn Hollywood Burn | Public Enemy | Fear of a Black Planet | 1990 |
| Power To The People | Public Enemy | Fear of a Black Planet | 1990 |
| Who Stole The Soul? | Public Enemy | Fear of a Black Planet | 1990 |
| Fear Of A Black Planet | Public Enemy | Fear of a Black Planet | 1990 |
| Revolutionary Generation | Public Enemy | Fear of a Black Planet | 1990 |
| Can't Do Nuttin' For Ya Man | Public Enemy | Fear of a Black Planet | 1990 |
| Reggie Jax | Public Enemy | Fear of a Black Planet | 1990 |
| B Side Wins Again | Public Enemy | Fear of a Black Planet | 1990 |
| War at 33 1/3 | Public Enemy | Fear of a Black Planet | 1990 |
| Final Count Of The Collison Between us and The Damned | Public Enemy | Fear of a Black Planet | 1990 |
| Fight The Power | Public Enemy | Fear of a Black Planet | 1990 |
| Lost At Birth | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |

**Schedule "A"** (consisting of 2 pages below)                                        Page 2

Made part of the Direction Letter and Assignment of Copyright dated October 22, 2001 by and between

Bring the Noize Music, Inc. and Terrordome Music Publishing LLC

| SONGS (musical compositions) | ARTIST (first performed) | ALBUM (Primary Release) | Initial Year of Release |
|---|---|---|---|
| Rebirth | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| Nighttrain | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| Can't Truss It | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| I Don't Wanna Be Called Yo Niga | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| How To Kill A Radio Consultant | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| By The Time I Get To Arizona | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| Move! | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| 1 Million Bottlebags | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| More News At 11 | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| Shut 'Em Down | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| A Letter To The New York Post | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |
| Get The Fuck Outta Dodge | Public Enemy | Apocalypse 91...The Enemy Strikes Black | 1991 |