Exhibit 2

**Terrordome Music Publishing, LLC.**
c/o Reach Global, Inc.
445 Park Avenue, 9th Floor
New York, NY  10022

AGREEMENT made as of this 25th day of April 2002, by and between Terrordome Music Publishing, LLC, 445 Park Avenue, New York, New York 10022 ("Publisher") and Carlton Ridenhour of 125 Camilla Court, Fairburn, GA 30213 ("Writer").

NOW, THEREFORE, it is agreed as follows:

1)   As of the date hereof, Writer hereby irrevocably and absolutely assigns, conveys and sets over unto Publisher, its affiliates, successors and assigns for the full term of the copyright and any extensions, renewals, restorations and revised terms thereof (the "Term"):

   (i)   an undivided one-hundred (100%) percent interest in all worldwide right, title, interest, and ownership of every nature, kind and description in and to Writer's share of all songs commercially recorded and/or released as of the date of this agreement, including those songs listed on the attached Schedule "A" as may be amended from time to time (hereinafter referred to as the "Songs"), including all versions and derivative works of the Songs and all copyrights or income participation rights in such other versions or derivative works; all causes of action for infringement of the same, past present and future; all proprietary rights; and all other rights (existing, contingent, expectant or otherwise) whether now or hereafter known to with respect thereto; and all the results and proceeds from the foregoing accrued and unpaid and hereafter accruing; and

   (ii)   sole and exclusive administration rights in and to the Songs and to collect all royalties and fees (including royalties and fees accrued, earned or payable prior to the date of this agreement) with respect thereto throughout the world.

2)   Writer will execute and deliver to Publisher such instruments of transfer and other documents regarding the rights of Publisher in the Songs as Publisher may reasonably request to carry out for the purposes of this agreement (including, without limitation, the Assignment of Copyright annexed hereto), and with respect to each document that Writer fails to sign and return to Publisher within 10 days after Publisher has submitted that document to Writer, Publisher may sign that document in the name of Writer and make appropriate disposition of that document.

3)   (i)   In further consideration of this agreement, Publisher shall retain an amount equal to fifty (50%) percent of all gross sums generated by the Songs. Conditioned upon compliance by Writer with the material terms, conditions, representations, warranties and agreements made by Writer in this agreement, Publisher agrees to pay to Writer, and Writer agrees to accept in full payment, an amount equal to fifty (50%) percent of all gross sums earned by the exploitation of the rights granted under this agreement and actually received by Publisher in U.S. dollars in the U.S.A.

   (ii)   Writer's share of the gross sums are payable to Writer after deducting: (a) charges made by mechanical licensing societies and/or performing rights societies; (b) subpublishers' fees and/or foreign collection commissions (c) any income or

other tax (including withholding taxes and V.A.T.) as required by the taxing authorities in each country; (d) foreign exchange fees and international bank wire transfer fees; and (e) copyright registration fees. *(F.) an administration Fee of ten (10%) percent.*

        (iii)    (a)    With respect to performance income (it being understood that only the composers and authors (the "Writers") of the Songs shall collect and be entitled to retain 100% of their so-called writer's share of performance income directly), Publisher shall retain one-hundred (100%) percent of all sums (i.e., so called "Publisher's Share") earned in lieu of the provisions set forth in paragraph 4(i) above.

    4)    If Writer receives any royalties or other compensation of any kind with respect to the Songs (excluding the so-called writer's share of performance income) from any source other than Publisher during the Term, Writer agrees to pay over to Publisher all such sums, together with any accounting statement. If Writer does not pay over to Publisher such sums, Publisher can deduct these sums from the payment of royalties to Writer.

    5)    (i)    Publisher shall keep true and correct accounts, books and records. Royalty statements and payments made by Publisher to Writer shall be made within ninety (90) days after the end of each semi-annual accounting period ending December 31st and June 30th.

        (ii)    Each accounting and payment, in the absence of written objection thereto, shall become final within one (1) year of the rendering of each such royalty statement.

    6)    (i)    Writer warrants and represents that it controls no less than the percentages listed on the attached Schedule "A".

        (ii)    ~~If, after signature of this agreement, it is determined that Writer controls less than the Song percentages listed on the attached Schedule "A" then Publisher shall be "made whole" of this diminution by increasing its copyright ownership and the share it retains from the gross sums payable to Writer, in order to equal the original ownership and sums Publisher would have earned if the original percentage splits in Schedule "A" would have been adhered to.~~

    7)    This Agreement; which shall be binding upon Writer's respective parents, affiliates, successors and assigns; is the entire agreement between the parties with respect to the subject matter hereof and shall not be modified, except by an instrument in writing, signed by each of the parties. The parties hereto are independent contractors and nothing contained herein shall be construed a joint venture or partnership between the parties.

    8)    In the event that Publisher enters into any suit or proceeding to protect or enforce the rights granted to it hereunder, and in the event of any recovery therefrom, the proceeds thereof, after deduction from the gross amount thereof of all direct, out-of-pocket expenses of litigation (including, but not limited to, reasonable outside attorneys' fees, legal expenses and court costs) shall be divided between Publisher and Writer in the same percentages as provided in paragraph 3 of this agreement.

9) Writer warrants and represents that it has the full right, power and authority to enter into this agreement and to grant Publisher the rights herein granted.

10) Writer agrees to and does hereby indemnify, save and hold Publisher harmless from and against any and all loss and damage (including, without limitation, reasonable attorneys' fees and legal costs) arising out of or connected with the Songs or any claim which is inconsistent with any of the warranties, representations, covenants or agreements made by Writer in this agreement. Pending the determination of any such claim, Publisher may withhold the payment of royalties, including, without limitation, any Writer's share of royalties to the extent that the Writer is the writer of a Song subject to this indemnity or in the event the Writer or a person or entity owned or controlled by the Writer or an affiliate thereof is a member of Writer, in an amount reasonably related to potential liability of Writer under this indemnity, including direct, out-of-pocket legal costs expended by Publisher.

11) If in any jurisdiction, any provision of this agreement or its application to any party or circumstance is prohibited, unenforceable or otherwise restricted, such provision shall, as to such jurisdiction, be ineffective only to the extent of such restriction and without affecting the validity or enforceability of such provision in any other jurisdiction or its application to other parties or circumstances. In addition, if any one or more of the provisions contained in this agreement shall for any reason in any jurisdiction be held to be excessively broad as to time, duration, scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law of such jurisdiction as it shall then appear.

**IN WITNESS WHEREOF**, the parties have executed this agreement as of the date first above written.

By: _/s/ Michael Closter_
Michael Closter
TERRORDOME MUSIC PUBLISHING, LLC.

By: _/s/ Carlton Ridenhour_
Carlton Ridenhour

## ASSIGNMENT OF COPYRIGHT

For good and valuable consideration, receipt of which is hereby acknowledged, Carlton Ridenhour hereby sells, assigns, transfers and sets over unto TERRORDOME MUSIC PUBLISHING, LLC., its affiliates, successors and assigns, an undivided one-hundred (100%) percent interest in all of the undersigned's right, title and interest of whatsoever kind or nature in and to the musical compositions listed on the attached Schedule "A", including, but not limited to, the undersigned's ownership of the copyright therein and all rights to and under the copyright for the full term of the copyright and any extensions, renewals or revised terms thereof in the United States and elsewhere throughout the world; all versions and derivative works of said composition and all copyrights in such other versions or derivative works; all causes of action for infringement of the same, past present and future; all proprietary rights; and all other rights (existing, contingent, expectant or otherwise) whether now or hereafter known to with respect thereto; and all the results and proceeds from the foregoing accrued and unpaid and hereafter accruing.

Carlton Ridenhour and Terrordome Music Publishing, LLC. have entered into a formal agreement, dated April 25, 2002 (the "Agreement") relating to the transfer of the foregoing rights, which rights are more fully described in the Agreement, and this instrument is expressly made subject to all of the terms, conditions and provisions contained in the Agreement.

If any provision of the assignment shall be held void, invalid or inoperative, no other provision of this instrument of transfer shall be affected as a result thereof and, accordingly; the remaining provisions of this instrument of transfer shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 25th day of April 2002.

By: _____
Carlton Ridenhour

## Schedule "A" (2 pages total)

Attached to and made a part of the Agreement and Assignment of Copyright dated as of April 25, 2002 by Carlton Ridenhour and Terrordome Music Publishing, LLC

| SONG TITLE | ARTIST | ALBUM (Primary Release) | YEAR | WRITER SHARE: Carlton Ridenhour |
|---|---|---|---|---|
| Tie Goes to the Runner | Public Enemy | Greatest Misses | 1992 | 50.00% |
| Hit Da Road Jack | Public Enemy | Greatest Misses | 1992 | 62.50% |
| Gett Off My Back | Public Enemy | Greatest Misses | 1992 | X |
| Gotta Do What I Gotta Do | Public Enemy | Greatest Misses | 1992 | 55.55% |
| Air Hoodlum | Public Enemy | Greatest Misses | 1992 | 65.00% |
| Hazy Shade of Criminal | Public Enemy | Greatest Misses | 1992 | 52.50% |
| Living In A Zoo | Public Enemy | CB4 (Original M.P. Soundtrack) | 1993 | 20.00% |
| Whole Lotta Love Goin On In The M | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| Give It Up | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 20.00% |
| What Side You On? | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 20.00% |
| Bedlam 13:13 | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| Stop In The Name... | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| What Kind Of Power We Got | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | X |
| So Whatcha Gone Do Now? | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| White Heaven/Black Hell | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 25.00% |
| Race Against Time | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| Aintnuttin Buttersong | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 16.67% |
| Live And Undrugged Pt. 1 & 2 | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| Thin Line Between Law & Rape | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| I Ain't Mad At All | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | X |
| Death Of A Carjacka | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 66.67% |
| I Stand Accused | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 33.33% |
| Godd Complexx | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | X |
| Hitler Day | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 50.00% |
| Living In A Zoo (Remix) | Public Enemy | Muse Sick-N-Hour Mess Age | 1994 | 20.00% |
| Mistachuck | Chuck D | Autobiography of Mistachuck | 1996 | 50.00% |
| No | Chuck D | Autobiography of Mistachuck | 1996 | 45.00% |
| Generation Wrekkked | Chuck D | Autobiography of Mistachuck | 1996 | 40.00% |
| Niggativity...Do I Dare Disturb the Ur | Chuck D | Autobiography of Mistachuck | 1996 | 50.00% |
| Free Big Willie | Chuck D | Autobiography of Mistachuck | 1996 | 35.00% |
| Horizontal Heroin | Chuck D | Autobiography of Mistachuck | 1996 | 25.00% |
| Talk Show Created the Fool | Chuck D | Autobiography of Mistachuck | 1996 | 50.00% |
| Underdog | Chuck D | Autobiography of Mistachuck | 1996 | 50.00% |
| But Can You Kill the Nigga in You? | Chuck D | Autobiography of Mistachuck | 1996 | 40.00% |
| Endonesia | Chuck D | Autobiography of Mistachuck | 1996 | 20.00% |
| The Pride | Chuck D | Autobiography of Mistachuck | 1996 | 40.00% |
| Paid | Chuck D | Autobiography of Mistachuck | 1996 | 30.00% |
| Resurrection | Public Enemy | He Got Game | 1998 | 35.00% |
| He Got Game | Public Enemy | He Got Game | 1998 | 17.50% |
| Unstoppable | Public Enemy | He Got Game | 1998 | 25.00% |
| Shake Your Booty | Public Enemy | He Got Game | 1998 | X |
| Is Your God A Dog | Public Enemy | He Got Game | 1998 | 40.00% |

| SONG TITLE | ARTIST | ALBUM (Primary Release) | YEAR | WRITER SHARE: Carlton Ridenhour |
|---|---|---|---|---|
| House of the Rising Son | Public Enemy | He Got Game | 1998 | 20.00% |
| Revelation 33 1/3 Revolutions | Public Enemy | He Got Game | 1998 | 15.00% |
| Game Face | Public Enemy | He Got Game | 1998 | X |
| Politics of the Sneaker Pimps | Public Enemy | He Got Game | 1998 | 50.00% |
| What You Need Is Jesus | Public Enemy | He Got Game | 1998 | 50.00% |
| Super Agent | Public Enemy | He Got Game | 1998 | 50.00% |
| Go Cat Go | Public Enemy | He Got Game | 1998 | 50.00% |
| Sudden Death (Interlude) | Public Enemy | He Got Game | 1998 | X |
| Do You Wanna Go Our Way??? | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| LSD | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| Here I Go | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| 41:19:00 | Public Enemy | There's a Poison Goin' On | 1999 | 25.00% |
| Crash | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| Crayola | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| First The Sheep Next The Shepherd? | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| World Tour Sessions | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| Last Mass Of The Caballeros | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| I | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| What What | Public Enemy | There's a Poison Goin' On | 1999 | X |
| Kevorkian | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| Swindlers Lust | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |
| Kill Em Live [Bonus Track] | Public Enemy | There's a Poison Goin' On | 1999 | 50.00% |