Exhibit 3

# TERRORDOME MUSIC PUBLISHING, LLC

## OPERATING AGREEMENT

Dated: As of January 10, 2002

253024

OPERATING AGREEMENT
FOR
TERRORDOME MUSIC PUBLISHING, LLC

AGREEMENT dated as of January 10, 2002 is by and among BRING THE NOIZE MUSIC, INC., a New York corporation ("**BTNM**"), REACH GLOBAL, INC., a Delaware corporation ("**Reach Global**") and KNIGHT OWL PRODUCTIONS, LTD., an Illinois corporation ("**Knight Owl**"). (BTNM, Reach Global and Knight Owl are sometimes hereinafter referred to individually as "**Member**" or collectively as the "**Members**".)

## WITNESSETH:

**WHEREAS**, the parties hereto desire to form a limited liability company pursuant to the New York Limited Liability Company Act and adopt this Agreement in connection therewith; and

**WHEREAS**, by executing this Agreement, each Member represents that it has sufficient right and authority to execute this Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements set forth herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows effective as of the date first written above.

## ARTICLE 1
## DEFINITIONS

1.1   For purposes of this Agreement, the following terms shall have the definitions set forth below:

"**Act**": means the New York Limited Liability Company Act and any successor statute, as may be amended from time to time.

"**Additional Capital Contribution**": shall mean the amount of capital contributed to the Company pursuant to Section 4.1 subsequent to the date hereof by an existing Member or a newly admitted Member.

"**Additional Member**": means any person or entity admitted as a Member of the Company pursuant to this Agreement.

"**Affiliate**": means: (a) any entity or individual that directly or indirectly controls or holds the power to vote fifty percent (50%) or more of the outstanding voting securities of the Person in question; (b) any Person fifty percent (50%) or more of whose voting securities are

directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; and (d) if such other Person is an officer, director or partner, any company for which such Person acts in any such capacity.

"**Agreement**": means this Operating Agreement as originally executed and as amended, modified, supplemented or restated from time to time.

"**Articles of Organization**": The Articles of Organization of the Company filed with the Secretary of State of the State of New York, pursuant to the Act to form the Company, as originally executed in the form attached hereto as Exhibit A and as amended, modified, supplemented or restated from time to time.

"**Bona Fide Offer**": shall have the meaning as set forth in Section 12.3.

"**Capital Account**" or "**Capital Accounts**": shall have the meaning as set forth in Section 3.3.

"**Capital Contribution**": means, with respect to any Member or any other Person who is admitted as a Member), any money or other property contributed by such Member or Person to the capital of the Company.

"**Capital Proceeds**" means the cash proceeds received by the Company from or in connection with any Capital Transaction, less all costs and expenses incurred by the Company in connection with such Capital Transaction.

"**Capital Transaction**" means any sale, exchange or other disposition by the Company of all or substantially all of the Property.

"**Capital Transaction Gain**" or "**Loss**" shall mean the Company's gain or loss (as the case may be) for federal income tax purposes (as computed for book purposes), resulting from a Capital Transaction.

"**Code**": The Internal Revenue Code of 1986, as amended. Any reference to a particular Section of the Code shall be deemed to include any successor Section or provision to such Section.

"**Company**": means Terrordome Music Publishing, LLC., a New York limited liability company.

"**Fiscal Year**": means the Company's fiscal year, which shall commence on January 1st and end on December 31st of each year, provided that the first fiscal year of the Company shall be deemed to have commenced upon the filing of the Articles of Organization and shall end on December 31, 2001.

"**For Cause**": means the occurrence of any of the following events:

(a) death or dissolution of the Managing Member, (b) a disabling illness or injury to the Managing Member, whether physical or mental, which (x) results in the Managing Member's failure to perform the duties required of the Manager Member hereunder for a period of one hundred twenty (120) consecutive days in any three hundred sixty day (360) period or (y) upon the medical examination of the Managing Member by two experts (one selected by the Managing Member and one selected by the remaining Members), the Members having Majority Consent determine that the Managing Member is unable to perform the duties required of the Managing Member hereunder; (c) the expiration of sixty (60) days after written notice signed by all of the remaining Members to the Managing Member of Managing Member's gross negligence, willful misconduct, fraud or persistent failure to perform the duties of Managing Member hereunder (which notice shall specifically identify the acts or omissions which the remaining Members believe constitute the Managing Member's gross negligence, willful misconduct, fraud or persistent failure) if such gross negligence, willful misconduct, fraud or ~~willful and~~ persistent failure is not cured during such sixty (60) day period; provided, however, that no act or omission by the Managing Member shall be deemed "For Cause" if the act or omission was pursuant to any express policy of the Company or pursuant to the express direction of the Members having Majority Consent or pursuant to a good faith and reasonable business decision by the Managing Member in the performance of his or its duties under this Agreement.

For the purposes of subsections (a) and (b) above, so long as Reach Global is the Managing Member, the term "For Cause" shall include the occurrence of such events with respect to Michael Closter, individually.

"**Initial Capital Contribution**": shall mean the initial amount of capital contributed to the Company by the Members. The Initial Capital Contribution of the original Members as of the date hereof is set forth in Schedule A attached hereto.

"**Interest**": shall mean the ownership interest of a Member, from time to time, including such Member's Capital Contributions, Percentage Interest, Capital Account and any and all other benefits to which the holder of such interest may be entitled, as provided in this Agreement and by applicable law, together with all obligations of such Member to comply with the terms and provisions of this Agreement.

"**Managing Member**": shall mean the Member designated as the "managing member" of the Company pursuant to Section 7.1(a).

"**Majority Consent**": means the prior consent of those Members who hold a majority-in-interest of the Percentage Interests in the Company.

"Net Profit" and "Net Loss": means, for each Fiscal Year of the Company, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code; provided, however, that such taxable income or loss shall be further adjusted as follows: (i) such taxable income or loss shall reflect all Company items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code; (ii) such taxable income or loss shall be increased by any tax-exempt income of the Company and reduced by any expenditures of the Company that can neither be capitalized nor deducted; and (iii) such taxable income or loss shall not include any items of Company income, gain, loss or deduction which is specially allocated to any Member pursuant to Section 6.4(b)). If the Company's taxable income or loss for a Fiscal Year, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Net Profit for such Fiscal Year; and if a negative amount, such amount shall be the Company's Net Loss for such Fiscal Year. Net Profit or Net Loss shall not include any item of Company income, gain, loss or deduction that is taken into account in determining the Capital Transaction Gain or Capital Transaction Loss of the Company.

"Operating Cash Flow": means the gross receipts, net proceeds and all other revenues and amounts received by the Company (including any net proceeds received by the Company from any financing or refinancing, sale or other disposition of any of its Property or any other capital event or other transaction, whether or not in the ordinary course of the Company's business, as well as any decrease of any reserves previously established for the Company for working capital and other purposes as the Managing Member shall determine), less all cash expenses of the Company including, without limitation, (i) taxes and other costs and expenses of the Company which were paid or are payable by the Company, and (ii) the establishment of or increase of any reserves established for the Company by the Managing Member from time to time for working capital and other purposes (including, if the Managing Member shall so determine, for the purpose of enabling the Company to have a sufficient amount of funds to repay any interest, principal and other fees in respect of any loans made to the Company and/or which are secured by any of the Property). In general, and except to the extent that the Managing Member establishes or increases the reserves of the Company for such purpose, Operating Cash Flow shall not reflect a reduction for any payments of interest, principal or fees on any Company loans as such amounts shall be paid out of Operating Cash Flow pursuant to Section 5.1(a). Operating Cash Flow shall exclude any proceeds, costs and expenses from a Capital Transaction that is reflected in the determination of Capital Proceeds.

"Percentage Interest": means, for any Member, the percentage set forth opposite such Member's name on Schedule B attached hereto, as such Schedule may be amended from time to time to reflect a change in such percentages (including, but not limited to, by reason of the admission of new Members).

"Person": means any natural person, corporation, governmental authority, trust, partnership, joint venture, limited liability company, unincorporated association or other entity.

"Property": means, individually or collectively, any and all of the property, assets and rights of any type owned by the Company.

"**Reach Global Purchase Right**": means the following right of Reach Global: In the event that the Company or any Member shall receive a Bona Fide Offer (as defined in Section 12.3) to purchase all or substantially all of the assets of the Company (the "Offered Assets"), and in the further event that the Members having Majority Consent vote to approve such sale (in accordance with Section 7.2(j) hereof), the Company shall send a written notice to Reach Global offering to sell to Reach Global ("Reach Global Offer") all, but not less than all, of the Offered Assets on the same terms and conditions as set forth in the Bona Fide Offer. The Reach Global Offer shall remain open and irrevocable until the expiration of the 5 business day period beginning with Reach Global's receipt of the aforementioned notice (the "Reach Global Exercise Period"). Reach Global may accept the Reach Global Offer by a written notice of acceptance to the Company and the remaining Members prior to the expiration of the Reach Global Exercise Period. If Reach Global elects to accept the Reach Global Offer, the closing of sale and purchase of the Offered Assets shall be take place within sixty (60) days of the expiration of the Reach Global Exercise Period at a mutually agreeable time and place. In the event that Reach Global declines the Reach Global Offer or fails to accept the Reach Global Offer prior to the expiration of the Reach Global Exercise Period, the Company may consummate the sale of the Offered Assets pursuant to the terms of the Bona Fide Offer but only on material terms and conditions which are no more favorable than those contained in the Reach Global Offer. If the closing of such sale has not occurred with sixty (60) days after the expiration of the Reach Global Exercise Period, the Company may not sell the Offered Assets to any party unless and until it shall have re-offered the Offered Assets to Reach Global under the procedures specified herein.

"**Registered Notice**": shall have the meaning as set forth in Section 12.3.

"**Transfer**": means, with respect to any Interest (or any portion), any transfer, assignment, sale, exchange, mortgage, pledge, hypothecation, grant of a security interest in, encumbering or other disposition of, whether by operation of law or otherwise, all or any portion of such Interest.

"**Unrecovered Capital Contribution**": means, for any Member, the aggregate amount of Capital Contributions which are made by such Member, reduced by the aggregate amount of distributions theretofore made to such Member pursuant to Section 5.1(b). For the purposes of Section 5.1(a) only, the term "Unrecovered Capital Contribution" shall only apply to Capital Contributions in the form of cash and amounts paid on behalf of the Company.

## ARTICLE 2
## FORMATION

2.1     **Name and Formation.** The parties hereto do hereby form the Company under the name of Terrordome Music Publishing, LLC pursuant to the Act. The rights and obligations of the Members shall be as set forth in the Act except as this Agreement expressly provides otherwise. The Articles of Organization of the Company that have been filed are hereby adopted and ratified by the Members. In the event of a conflict between the terms of this Agreement and the terms of the Articles of Organization, the terms of the Articles of Organization shall prevail.

2.2 **Documentation**. Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Company deems necessary, useful or appropriate to comply with any acts, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement, to preserve the Company as a limited liability company under the Act and to enable the Company to be taxed as a partnership for federal and state income tax purposes.

2.3 **Registered Office and Agent**. The Company's registered office in New York shall be Secretary of State, Department of State, Division of Corporations and State Records, 41 State Street, Albany, New York 12207. At any time, the Company may designate another registered office and/or agent.

2.4 **Principal Office**. The principal place of business of the Company shall be 445 Park Avenue, 9th Floor, New York, NY 10022. At any time, the Company may change the location of its principal place of business and may establish additional offices.

2.5 **Term**. The Company shall commence upon the filing of the Articles of Organization, and shall continue in full force and effect in perpetuity; provided, however, that the Company shall be dissolved prior to such date upon the happening of any of the events described in Article 11.

2.6 **Purpose**. The purpose of the Company shall be to carry out any business, purpose or activity permitted under the Act or the laws of any jurisdiction in which the Company may do business. The Company shall have the authority to do all things necessary or advisable in order to accomplish such purposes.

2.7 **Entity Declaration**. The Members intend for the Company to be classified, and to be treated, as a partnership for federal, state and local tax purposes. No Member shall take any action inconsistent with this express intent of the Members. This Agreement shall be interpreted in such a way that the provisions comply with applicable portions of Subchapter K of the Code. In the absence of a specific provision covering a specific matter, or in the event of conflict between a provision of this Agreement and Subchapter K of the Code and the Regulations thereunder, the provisions of Subchapter K of the Code and the Regulations thereunder shall apply. Other than for tax purposes, the Company shall not be treated as a general partnership, limited partnership or a joint venture, and no Member shall be considered a partner or joint venturer of or with any other Member, and this Agreement shall not be construed otherwise. No Member shall have any liability or obligation to the Company or to any other Member other than as specifically provided for herein.

2.8 **Title to Company Property**. Title to all property owned by the Company shall be held in the name of the Company, and none of the Members shall (or shall be deemed to) by virtue of being a Member, own any interest in any property held by the Company.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS BY THE MEMBERS

3.1   **Capital Contributions.** As its initial Capital Contribution, each Member shall contribute the amount of cash and the other property set forth opposite such Member's name on Schedule A attached hereto.

3.2   **Return of Capital.** No Member shall have the right to withdraw any part of its Capital Contributions or receive any distributions from the Company, except in accordance with the provisions of this Agreement. No interest shall be paid on any Member's Unrecovered Capital Contributions. No Member shall have any priority over any other Member with respect to the return of their Unrecovered Capital Contributions or other amounts that any Member is entitled to receive from the Company, other than as provided in this Agreement.

3.3   **Capital Accounts.** The Company shall establish and maintain capital accounts for each Member (for each Member, such Member's "**Capital Account**") throughout the full term of the Company in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv), as such regulation may be amended from time to time. To the extent not inconsistent with such rules, the following shall apply:

(a) The Capital Account of each Member shall be: (1) credited with: (i) the amount of money and the fair market value of other property (as reasonably determined by the Managing Member) contributed to the capital of the Company by such Member (net of liabilities securing such contributed property that the Company pursuant to Section 752 of the Code is considered to assume or take subject to), (ii) amounts paid or incurred on behalf of the Company by such Member if authorized under this Agreement, and (iii) such Member's share of the Company's Net Profits (and other items of Company income and gain not reflected in any Net Profits or Net Losses of the Company), and (2) debited by: (i) the amount of cash and the fair market value of other property (as reasonably determined by the Managing Member) distributed to such Member (net of liabilities assumed by such Member and liabilities to which such distributed property is subject), and (ii) such Member's share of the Company's Net Losses (and other items of Company loss and deductions not reflected in any Net Profits or Net Losses of the Company).

(b) Upon the transfer of any Interest in the Company after the date of this Agreement, (x) if such transfer does not cause a termination of the Company within the meaning of Section 708(b)(1)(B) of the Code, the Capital Account of the transferor Member that is attributable to such transferred Interest will be carried over to the transferee Member but, if the Company has a Code Section 754 election in effect, the Capital Account will not be adjusted to reflect any adjustment under Section 743 of the Code except as provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m), or (y) if such transfer causes a termination of the Company within the meaning of Section 708(b)(1)(B) of the Code, the income tax consequences of the deemed contribution of the Property to a new Company (which for all other purposes continues to be the Company) and of the deemed immediate distribution of interests in the new Company shall be

253024                                                         8

governed by the relevant provisions of Subchapter K of Chapter 1 of the Code and the Treasury Regulations promulgated thereunder, and the Capital Accounts of the Members in the new Company shall be determined in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

(c) Upon (i) the "**liquidation of the Company**" (as defined in Section 3.3(d), below), (ii) the distribution of money or property to a Member as consideration for an Interest in the Company, or (iii) the contribution of money or (if permitted pursuant to (a) above) property to the Company by a new or existing Member as consideration for an interest in the Company, then adjustments shall be made to the Members' Capital Accounts in the following manner: All Property of the Company which is not sold in connection with such event shall be valued at its then fair market value (as the Managing Member shall reasonably determine). Such value shall be used to determine both the amount of gain or loss which would have been recognized by the Company if the property had been sold for such value (subject to any debt secured by the property) at such time, and the amount of Operating Cash Flow, which would have been distributable by the Company pursuant to Section 6.2 if the property had been sold at such time for said value, less the amount of any debt secured by the property. The Capital Accounts of the Members shall be adjusted to reflect the deemed allocation of such hypothetical gain or loss in accordance with Article 6. The Capital Accounts of the Members (or of a transferee of a Member), and the Net Profits and Net Losses of the Company, including depreciation with respect to, and gain or loss arising from, the sale or disposition of any revalued Property or Property described in Treasury Regulations Section 1.704-1(b)(2)(iv), shall be adjusted to reflect "book items" and not tax items in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4)(i).

(d) For purposes of this Section 3.3, the term "**liquidation of the Company**" shall mean (A) a termination of the Company effected in accordance with this Agreement, which shall be deemed to occur, for purposes of this Article 3, on the date upon which the Company ceases to be a going concern and is continued in existence solely to wind-up its affairs, or (B) a termination of the Company pursuant to Section 708(b)(1) of the Code.

## ARTICLE 4
## ADDITIONAL CAPITAL CONTRIBUTIONS/LIABILITY OF MEMBERS

4.1 **Additional Capital Contributions**. Except as expressly provided in Section 3.1, no Member shall be required to make Capital Contributions to or otherwise contribute money or property to the capital of the Company to restore a deficit in the Member's Capital Account existing at any time or for any reason. In the event the Managing Member determines that the Company requires additional capital to further its business or satisfy its obligations, the Company shall make available the opportunity of investing further in the Company to each of the Members in proportion to their respective Percentage Interests. In the event that the Company is unable to receive a commitment from all of the Members to invest their pro-rata share of the additional capital sought by the Company, any Member committing to invest its pro rata share of such additional capital may elect, in lieu of making an Additional Capital Contribution, to make a loan without interest of such funds to the Company on terms and conditions mutually agreeable to the Company and such Member.

4.2 **Liability of Members.** No Member shall be bound by, or personally liable for, any debt, expense, liability or obligation of the Company or of any other Member, nor shall any Member be liable under a judgment, decree or order of a court against the Company or any other Member or to which the Company or any other Member is subject. Finally, no Member shall be required to lend any money or other property to the Company or to any other Member.

4.3 **Managing Member's Exculpation of Liability.** To the fullest extent permitted by the laws of the State of New York, as they may exist or may hereafter be amended, the Managing Member shall not be personally liable to the Company or to any Member for damages for breach of any duty owed to the Company or its Members.

## ARTICLE 5
## DISTRIBUTIONS

5.1 **Distributions of Operating Cash Flow.** Subject to the terms of any third party loan agreement to which the Company may be or become a party, the Operating Cash Flow of the Company shall be computed, and distributed, by the Managing Member on a quarterly basis as soon as is practicable after such funds are generated in the following order of priority:

(a) first, to the payment of interest, principal, fees and other charges on or in respect of any loan to, or otherwise incurred or assumed by, the Company and/or which is secured by any Company Property, all in accordance with the terms of such loan;

(b) second, to the Members, in proportion to their respective Unrecovered Capital Contributions, until the Unrecovered Capital Contributions of the Members have been reduced to zero; and

(c) third, to the Members, in proportion to their Percentage Interests; provided, however, if a Member shall have any Tax Loan outstanding, then any amount otherwise distributable to such Member shall be applied instead in repayment of any Tax Loan (although such distribution shall nonetheless be treated, for all purposes of this Agreement, as a distribution to such Member of the same type as the distribution giving rise to the repayment).

The Members shall have no right to demand and/or receive property, other than cash, as a distribution.

5.2 **Distributions of Capital Proceeds.** Subject to the terms of any third party loan agreement to which the Company may be or become a party, the Company shall distribute any Capital Proceeds that it receives to the Members, at such times and in such amounts as the Managing Member may determine (but not later than sixty (60) days after the end of the calendar quarter in which the Capital Proceeds are received), as follows:

(a) first, to the Members in proportion to their respective aggregate Capital Contributions, until the aggregate amount distributed to the Members pursuant to this Section 5.2 shall equal the aggregate amount of Capital Contributions of such Members; and

(b) then, to the Members, in proportion to their respective Percentage Interests.

5.3 **Tax Withholding**. The Managing Member shall cause the Company to comply with any and all tax withholding obligations to which the Company is subject. In the event the Company is required to deduct and withhold, pursuant to the Code or any other federal, state or local law, rule or regulation which is currently in effect or which may be promulgated hereafter ("**Applicable Law**"), any amount from an actual distribution to a Member, the amount so deducted and withheld from such distribution shall, for all purposes of this Agreement, be treated as a distribution to such Member of the same type as the distribution giving rise to the obligation. In the event Applicable Law requires the Company to pay or withhold any amount on behalf of a Member (including any federal, state or local taxes) measured by a Member's distributive share of the Company's Net Profits or other items of Company income or gain, other than any amount required to be deducted and withheld from actual distributions to a Member, then the payment or withholding of any such amount shall be considered a loan ("**Tax Loan**") by the Company to such Member (the "**Borrowing Member**"). The Borrowing Member shall repay any such Tax Loan within 30 days after the Managing Member delivers a written demand therefor, together with interest at an annual rate equal to one percent (1%) per annum in excess of the rate announced from time to time in the Wall Street Journal as the "**prime rate**" for Citibank, N.A. from the date such loan was made until the date of the repayment thereof. In addition to any other rights of the Company to enforce its entitlement to receive payment of the Tax Loan, plus any accrued interest thereon, the Company may deduct from any distribution to be made to a Borrowing Member an amount not greater than the outstanding balance of any Tax Loan, plus any accrued interest thereon, as a payment in total or partial satisfaction thereof.

## ARTICLE 6
## TAX ALLOCATIONS

6.1 **Allocations of Net Profits**. Subject to Section 6.4, the Net Profits of the Company for each Fiscal Year of the Company shall be allocated by the Managing Member to the Members as follows:

(a) First, to the Members, in proportion to the aggregate amount of Net Losses theretofore allocated to each Member, until the aggregate amount of Net Losses so allocated to the Members shall equal the aggregate amount of Net Profits allocated to the Members pursuant to this Section 6.1(a);

(b) Then, to the Members, in proportion to the aggregate Operating Cash Flow distributed to the Members pursuant to Section 5.1(b), until the aggregate amount of Net Profits allocated to the Members pursuant to this Section 6.1(b) shall equal the aggregate amount of Operating Cash Flow distributed to the Members pursuant to Section 5.1(b);

(c) Then, to the Members, in proportion to their respective Percentage Interests.

Any credit available for income tax purposes shall be allocated to the Members in proportion to

their respective Unrecovered Capital Contributions. If the Company shall realize gain which is treated as ordinary income under Section 1245 or 1250 of the Code, such ordinary income shall be allocated to the Members who receive the allocation of the depreciation or cost recovery deduction that generated the ordinary income, which amount shall be allocated in the same proportions as such deductions.

      6.2    **Allocation of Net Losses**. Subject to Section 6.4, Net Losses and Capital Transaction Losses of the Company for any Fiscal Year of the Company shall be allocated to the Members as follows:

      (a) First, to those Members with positive Capital Account balances, and in proportion to said positive balances, until their positive Capital Account balances are reduced to zero; and

      (b) Then, to the Members, in proportion to their respective Percentage Interests.

      6.3    **Allocation of Capital Transaction Gain**. Any Capital Transaction Gain of the Company for any Fiscal Year of the Company shall be allocated to the Members as follows:

      (a)    first, there shall be allocated to those Members, if any, who have deficit balances in their Capital Accounts immediately prior to the Capital Transaction giving rise to such Capital Transaction Gain an amount of such gain equal to the aggregate amount of such deficit balances, which amount shall be allocated in the same proportion as such deficit balances;

      (b)    second, there shall be allocated to each Member an amount of Capital Transaction Gain equal to the amount by which (x) the aggregate Capital Proceeds derived from such transaction and distributable to each Member in accordance with Sections 6.2(a) and (b) (assuming such proceeds were distributable), exceeds (y) the balance, if any, in such Member's Capital Account after such Member's Capital Account has been adjusted to reflect the Capital Transaction Gain allocated to such Member pursuant to Section 6.3(a); provided, however, if there shall be an insufficient amount of Capital Transaction Gain to so allocate then the Capital Transaction Gain allocable under this Section 6.3(b) shall be allocated to the Members in proportion to the respective amounts determined to be allocable to the Members pursuant to this Section 6.3(b).

      (c)    Then, any remaining Capital Transaction Gain shall be allocated to the Members in proportion to their respective Percentage Interests.

If the Company shall realize gain from a Capital Transaction which is treated as ordinary income under Sections 1245 or 1250 of the Code, such ordinary income shall be allocated to the Members who received the allocation of the depreciation or cost recovery deduction that generated the ordinary income which amount shall be allocated in the same proportions as such deductions.

      6.4    **Special Allocations**. Notwithstanding anything herein to the contrary:

(a) In accordance with Sections 704(b) and (c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value (as shall be reasonably determined by the Managing Member), using any method selected by the Managing Member and which is not prohibited under Section 704(b) or 704(c) of the Code. In the event that Capital Accounts are ever adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2) to reflect the fair market value of any Company Property (which fair market value shall be reasonably determined by the Managing Member), subsequent allocations of income, gain, loss and deduction with respect to such asset shall, solely for tax purposes, take account of any variation between the adjusted basis of such asset and such fair market value, using any method selected by the Managing Member under the Treasury Regulations and which is not prohibited under Section 704(b) or 704(c) of the Code.

(b) The Company shall make such allocations of Company income, gain, deduction, loss and credit in such a manner as the Managing Member determines to be necessary so as to satisfy the requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2, and the provisions of said regulations are incorporated herein by reference. All "nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(b)(1)) of the Company for any Fiscal Year shall be allocated among the Members in accordance with their respective Percentage Interests.

(c) <u>Rules of Construction</u>. An allocation to a Member of Net Profits or Net Loss shall be treated as an allocation to such Member of each item of income, gain, loss and deduction that has been taken into account in computing such Net Profits or Net Loss.

## ARTICLE 7
## MANAGEMENT OF THE COMPANY

### 7.1 <u>Management; Actions by Managing Member</u>.

(a) The business and affairs of the Company shall be managed by the Managing Member. Except as provided in Section 7.2 below, all decisions concerning the business and affairs of the Company shall be made by the Managing Member. The Members hereby designate Reach Global as the Managing Member. Reach Global shall serve as the Managing Member until removed For Cause upon a vote of the Members having Majority Consent. Upon reasonable consultation with the Members, the Managing Member is hereby authorized to make all management decisions of the Company on behalf of the Members, including, but not limited to, the actions described in Section 7.1(b). The Managing Member may adopt such rules and regulations for the conduct of the meetings of the Members and the management of the Company not inconsistent with this Agreement and the Act. Except as provided above, the Managing Member may not be removed by the Members unless and until the Managing Member sells, transfers or otherwise disposes of all of its Interest in accordance with the terms of this Agreement. The Managing Member shall take all actions necessary on behalf of the Company to perform under this Agreement. Only the Managing Member, and no other Member, may act on behalf of, and has the authority to bind, the Company. The Managing

Member may delegate some or all of such authority to one or more Persons (including a Member) as provided for herein. The Managing Member may, by agreement or otherwise, appoint and/or replace individuals with such titles as it may elect, including the titles of President, Vice President, Treasurer and Secretary to act on behalf of the Company, with such power and authority as the Managing Member may delegate. In the event that the Managing Member resigns or is removed as provided hereinabove, the Members shall appoint a new Managing Member upon a vote of the Members constituting Majority Consent.

(b) Without limiting the generality of Section 7.1(a), the Managing Member shall have the power and authority on behalf of the Company:

(1) To execute contracts and guaranties and incur liabilities and other obligations in the ordinary course of the Company's business;

(2) To institute, prosecute and defend against any judicial or administrative proceeding in the Company's name;

(3) To open bank accounts in the name of the Company; and

(4) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

7.2 **Actions Requiring Majority Consent.** Majority Consent shall be required to take the following actions on behalf of the Company:

(a) To invest and reinvest the Company's funds, including the lending of money, and receive and hold property as security for repayment;

(b) To pay, and reimburse the Managing Member for, all expenses incurred in connection with the conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company, in all cases within or without the State of New York;

(c) To sell, transfer, convey, pledge, exchange or otherwise dispose of any Company property;

(d) To acquire additional property and assets on behalf of the Company;

(e) To borrow money from banks, other lending institutions, the Members or otherwise;

(f) To hypothecate, encumber, mortgage, and grant security interests in any of the Property;

(g) To employ, compensate, or otherwise engage any Member or an Affiliate of

any Member;

(h) To participate in partnerships, joint ventures, limited liability companies, corporations or other associations of any kind with any Person or Persons;

(i) Except for duties and powers expressly granted herein to the Tax Managing Member, to employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from the Company funds;

(j) Subject to the Reach Global Purchase Right, to sell all or substantially all of the assets of the Company; *provided, however*, that such sale is made in a single transaction having gross proceeds to the Company of not less than seven and one-half (7.5) times the Company's gross annual revenues for the Fiscal Year in which the Company achieved its highest gross annual revenues, or for the twelve month period immediately preceding the consummation of such sale, whichever is greater. Nothing contained in this subparagraph (j) shall in any way affect a Member's right to Transfer its Interest in accordance with Article 12 hereof.

7.3   **Actions Requiring Unanimous Consent**. Unanimous consent of the Members shall be required to take the following actions on behalf of the Company:

(a) To amend this Agreement;

(b) To amend the Articles of Organization;

(c) To merge or consolidate the Company with or into any other any other Person;

(d) To take any action in furtherance of the dissolution of the Company;

(e) To do any act in contravention of this Agreement or which is not in furtherance of the Purpose of the Company; or

(f) Except as otherwise permitted under Section 7.2(j), to sell all or substantially all of the assets of the Company.

7.4   **Actions by Members**. With respect to actions requiring Majority Consent, the Members may act by written consent or upon the vote of the Members at a regularly scheduled or special meeting (physical, telephonic or otherwise) of the Members (provided that notice of such meeting is given at least 5 days prior to such meeting). Except as otherwise provided in this Agreement, no Member shall have the right to control nor shall take part in the management or control of, the Company's day-to-day business or activities.

## ARTICLE 8
## BOOKS, RECORDS AND REPORTS

8.1 **Maintenance of Books and Accounts.** The Managing Member shall maintain, at the principal office of the Company, complete books of account, in which there shall be entered, fully and accurately, every transaction of the Company and shall include the following:

(a) A current list of the full name and last known business address of each Member;

(b) A copy of the Articles of Organization of the Company and all amendments thereto;

(c) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years; and

(d) Copies of the Company's currently effective written Agreement and copies of any financial statements of the Company. The books of account of the Company shall be kept on a tax accounting basis applied in a consistent manner. All determinations by the Tax Matters Member (as defined in Section 10.3 below) with respect to the treatment of any item or its allocation for Federal, state, or local tax purposes shall be binding upon all of the Members. Any Member shall have the right, from time to time, at its own expense, to cause its accountants and representatives to examine and audit the books and records of the Company, upon not less than ten (10) business days' written notice shall make such books and records available for such examinations and audits at reasonable hours during business days.

8.2 **Fiscal Year End.** The Fiscal Year of the Company shall commence on January 1st and end on December 31st of each year or shall be any other permissible fiscal period as determined by the Managing Member.

8.3 **Year End Reports.** Within a reasonable time after the end of each Fiscal Year of the Company, the Managing Member, at the expense of the Company, shall cause the accountants for the Company to deliver to each Member an annual financial statement of the Company for such fiscal year and a report setting forth each Member's share of the Company's Net Profits or Net Loss for such Fiscal Year and the total distributions made to each of the Members during such Fiscal Year. In addition, the Managing Member, at the expense of the Company, shall use good faith efforts to deliver to the Members by April 1st following the end of each Fiscal Year, a Schedule K-1 (or other substitute form), and any corresponding schedule or form for state, local and, as applicable, foreign tax purposes, setting forth such Member's allocable share of all items of income, gain, loss, deduction and credit of the Company for such Fiscal Year for federal income tax purposes. The Managing Member shall also provide to any Member any additional information pertaining to the Company as such Member may reasonably request in order to enable such Member to be able to prepare and file its federal, state and local income tax returns.

8.4   **Tax Returns.** The Managing Member, at the expense of the Company, shall cause to be prepared and timely filed (taking into account all timely filed extension requests) all federal, state and local tax and information returns and reports required of the Company. All books, records, balance sheets, statements, reports and tax returns required pursuant to this Article 8 shall be prepared at the expense of the Company.

8.5   **Other Filings.** In accordance with the Act, the Managing Member shall cause to be prepared and timely filed the requisite statements on behalf of the Company to qualify the Company to do business in any jurisdiction as may be required.

## ARTICLE 9
## INDEMNIFICATION

9.1   **Right to Indemnification.** Subject to the limitations and conditions provided in this Article 9 and in the Act, each person ("**Indemnified Person**") who was or is made a party to or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("**Proceeding**"), or any appeal in such a Proceeding or any action or investigation that could lead to such a Proceeding, by reason of the fact that any person was or is a Member, a Managing Member or an officer of the Company or was or is the legal representative of a manager, director, officer, member, venturer, proprietor, trustee, employee, agent or similar functionary of a Member, shall be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted within the scope of his authority, in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that such conduct was unlawful.

9.2   **Derivative Claims.** Subject to the limitations and conditions provided in this Section 9.2 and in the Act, the Company shall and does hereby indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such person is or was a Member, a Managing Member or an officer of the Company, the legal representative of a Member or officer, or manager, director, officer, member, venturer, proprietor, trustee, employee, agent or similar functionary of a Member against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit, if such person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for gross negligence, willful misconduct or fraud in the