UNITED STATES DISTRICT COURT FOR
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

REACH GLOBAL INC., REACH MUSIC PUBLISHING,
INC. and TERRORDOME MUSIC PUBLISHING, LLC,

                                Plaintiffs,

            -against-

CARLTON RIDENHOUR and BRING THE NOIZE MUSIC,
INC.,

                                Defendants.

-------------------------------------------------------------------x

CARLTON RIDENHOUR and BRING THE NOIZE MUSIC,
INC.,

                                Defendants and
                                Third-Party Plaintiffs,

            -against-

MICHAEL CLOSTER,

                                Third-Party Defendant.

-------------------------------------------------------------------x

Case No.
1:20-cv-00391-AKH

**MEMORANDUM OF
LAW IN SUPPORT OF
THE MOTION OF
PLAINTIFFS AND
THIRD-PARTY
DEFENDANT TO
DISMISS**

REITLER KAILAS & ROSENBLATT LLC
885 Third Avenue
New York, New York 10022
(212) 209-3050
*Attorneys for Plaintiffs*
 *Reach Global Inc., Reach Music*
 *Publishing, Inc. and Terrordome Music*
 *Publishing, LLC and Third-Party*
 *Defendant Michael Closter*

      - and -

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel. (310) 566-9800
*Attorneys for Plaintiffs Reach Global Inc., Reach*
 *Music Publishing, Inc. and Terrordome Music*
 *Publishing, LLC and Third-Party*
 *Defendant Michael Closter*

248485v1

# Table of Contents

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ...............................................................................................5

ARGUMENT ...................................................................................................................10

    I.    THIS COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS
         DEFENDANTS' SECOND AND THIRD COUNTERCLAIMS AND
         THIRD-PARTY CAUSES OF ACTION FOR FRAUD, DECLARATORY RELIEF
         AND RESCISSION ..........................................................................................10

    II.    DEFENDANTS' STATE LAW CONVERSION CLAIM SHOULD BE DISMISSED
         AS PREEMPTED BY THE UNITED STATES COPYRIGHT
         ACT..................................................................................................................18

    III.    DEFENDANTS' FOURTH COUNTERCLAIM AND FOURTH THIRD-PARTY
         CAUSE OF ACTION FOR AN ACCOUNTING SHOULD BE DISMISSED
         TO THE EXTENT DEFENDANTS SEEK AN ACCOUNTING BEYOND THE
         TIME PERIODS SET FORTH IN THE INCONTESTIBILITY PROVISIONS OF
         THE 2001 PUBLISHING AGREEMENT AND THE 2002 PUBLISHING
         AGREEMENT OR, TO THE EXTENT ROYALTY STATEMENTS WERE NOT
         PROVIDED, FOR ANY PERIOD EXCEEDING SIX YEARS BEFORE THE
         START OF THIS LITIGATION ..........................................................................21

CONCLUSION.................................................................................................................24

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Alamo Contract Builders, Inc. v. CTF Hotel Co.,
  242 A.D.2d 643 (2d Dep't 1997) ........................................................................................... 15

Allman v. UMG Recordings,
  530 F. Supp. 2d 602 (S.D.N.Y. 2006) ..................................................................................... 23

Ardis Health, LLC v. Nankivell,
  2012 WL 5290326 (S.D.N.Y. Oct. 23, 2012) ......................................................................... 19

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ........................................................................................................... 10, 11

Automated Irrigation Controls, LLC v. The Watt Stopper, Inc.,
  407 F. Supp. 3d 274 (S.D.N.Y. 2019) .................................................................................... 18

Avalos v. IAC/Interactivecorp,
  2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014) ......................................................................... 19

Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodservice Co.,
  730 F. Supp. 1209 (E.D.N.Y. 1990) ....................................................................................... 18

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007) ................................................................................................................ 11

Carrara v Carrara,
  29 Misc. 2d 907 (Westchester Cty. 1961), aff'd, 16 A.D.2d 695 (2d Dep't
  1962) ........................................................................................................................................ 16

Cash v. Titan Fin. Servs.,
  58 A.D.3d 785 (2d Dep't 2009) .............................................................................................. 14

Chambers v. Time Warner, Inc.,
  282 F.3d 147 (2d Cir. 2002) ..................................................................................................... 1

Clark Fitzpatrick, Inc. v. Long Island Rail Road Co.,
  70 N.Y.2d 382 (1987) ............................................................................................................. 20

Comtomark, Inc. v. Satellite Communications Network, Inc.,
  116 A.D.2d 499 (1st Dep't 1986) ........................................................................................... 15

ii

Driver Harris Co. v. Industrial Furnace Corp.,
    12 F. Supp. 918 (W.D.N.Y. 1935) ............................................................................................18

Drum Major Music Entertainment Inc. v. Young Money Entertainment, LLC,
    2012 WL 423350 (S.D.N.Y. Feb. 7, 2012)............................................................................19, 23

Ehrlich v. American Moninger Greenhouse Mfg. Corp,
    26 N.Y.2d 255 (1970) ..............................................................................................................16

Fesseha v. TD Waterhouse Investors Servs. Inc.,
    305 A.D.2d 268 (1st Dep't 2003) ............................................................................................21

FNF Touring LLC, v. Transform America Corp.,
    111 A.D.3d 401 (1st Dep't 2013) ............................................................................................12

G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Co.,
    870 F. Supp. 472 (E.D.N.Y. 1994) ..........................................................................................18

Gary Friedrich Enters., LLC v. Marvel Enters., Inc.,
    713 F. Supp. 2d 215 (S.D.N.Y. 2010)......................................................................................19

Gillman v. Chase Manhattan Bank, N.A.,
    73 N.Y.2d 1 (1988) ..................................................................................................................14

Global Network Communications, Inc. v. City of New York,
    458 F.3d 150 (2d Cir. 2006).......................................................................................................1

Gupta Realty Corp. v. Gross,
    251 A.D.2d 544 (2d Dep't 1998) ..............................................................................................14

Harper & Row, Publishers, Inc. v. Nation Enterprises,
    723 F.2d 195 (2d Cir. 1983), reversed on other grounds, 471 U.S. 539 (1985) ......................18

In the Matter of Incorporated Village of Saltaire v. Zagata,
    280 A.D.2d 547 (2d Dep't 2001) ..............................................................................................23

Ippolito v. Lennon,
    150 A.D.2d 300 (1st Dep't 1989) ............................................................................................20

Jeffers v. American Univ. of Antigua,
    125 A.D.3d 440 (1st Dep't 2015) ............................................................................................21

Kopel v. Bandwidth Tech. Corp.,
    56 A.D.3d 320 (1st Dep't 2008) ..............................................................................................20

Lennon v. Seaman,
    63 F. Supp. 2d 428 (S.D.N.Y. 1999)........................................................................................20

Mayer v. Josiah Wedgwood & Sons, Ltd.,
   601 F. Supp. 1523 (S.D.N.Y. 1985).................................................................................19

Mellencamp v. Riva Music Ltd.,
   698 F. Supp. 1154 (S.D.N.Y. 1988).................................................................................18

Metropolitan Trans. Auth. v. Triumph Advertising Productions, Inc.,
   116 A.D.2d 526 (1st Dep't 1986) ....................................................................................15

Miller v. Holtzbrinck Publishers, L.L.C.,
   377 F. App'x 72 (2d Cir. 2010) .......................................................................................19

Miller v. Holtzbrinck Publishers, LLC,
   2008 WL 4891212 (S.D.N.Y. Nov. 11, 2008)................................................................19

Mills v. Polar Molecular Corp.,
   12 F.3d 1170 (2d Cir. 1993)............................................................................................12

New London Assocs., LLC v. Kinetic Soc. LL,
   384 F. Supp. 3d 392 (S.D.N.Y. 2019).............................................................................19

New Paradigm Software Corp. v. New Era of Networks, Inc.,
   2002 WL 31749396 (S.D.N.Y. Dec. 9, 2002) ...............................................................18

New York University v. Continental Ins. Co.,
   87 N.Y.2d 308 (1995) .....................................................................................................14

Noufrios v. Murat,
   193 A.D.2d 791 (2d Dep't 1993) ....................................................................................15

Orix Credit Alliance, Inc. v. R.E. Hable Co.,
   256 A.D.2d 114 (1st Dep't 1998) ....................................................................................15

Patrick v. Francis,
   887 F. Supp. 481 (W.D.N.Y. 1995)................................................................................19

Peters Griffin Woodward, Inc. v. WCSC, Inc.,
   88 A.D. 2d 883 (1st Dep't 1982) .....................................................................................20

Phansalkar v. Andersen Weinroth & Co.,
   175 F. Supp. 2d 635 (S.D.N.Y. 2001).............................................................................20

Pimpinello v. Swift & Co.,
   253 N.Y. 159 (1930) .......................................................................................................14

R.A. Assocs. v. Lerner,
   265 A.D.2d 541 (2d Dep't 1999) ....................................................................................14

Raske v. Next Management, LLC,
    2013 WL 5033149, 10 (N.Y. Sup. Sept. 12, 2013)....................................................................20

Rodriguez v. It's Just Lunch, Int'l,
    2010 WL 685009 (S.D.N.Y. Feb. 23, 2010)..............................................................................12

Savage v. Galaxy Media & Mktg. Corp.,
    526 F. App'x 102 (2d Cir. 2013) ...............................................................................................11

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994)........................................................................................................12

Steven J. Kaye Assoc. v. Law Offices of Mitchell N. Kay,
    2012 WL 123564 (Sup. Ct. N.Y. Co. Jan. 9, 2012)....................................................................21

Stewart v. World Wrestling Fed'n Entertainment, Inc.,
    2005 WL 66890 (S.D.N.Y. Jan. 11, 2005) .................................................................................19

Strauss v. The Hearst Corp.,
    1988 WL 18932 (S.D.N.Y. Feb. 19, 1988)..................................................................................19

Sun Micro Med. Techs. Corp. v. Passport Health Communications, Inc.,
    2006 WL 3500702 (S.D.N.Y. Dec. 4, 2006) ..............................................................................19

Tesoro Petroleum v. Holborn Oil Co.,
    108 A.D.2d 607 (1st Dep't 1985) ...............................................................................................15

Toto, Inc. v. Sony Music Entertainment,
    2012 WL 6136365 (S.D.N.Y. Dec. 11, 2012) ............................................................................23

Uncle Jam Records & Tape Int'l, Inc. v. Warner Bros. Records, Inc.,
    1983 WL 1144 (S.D.N.Y. Sept. 23, 1983)..................................................................................19

Wood v. Lucy, Lady Duff-Gordon,
    222 N.Y. 88 (1917) ...............................................................................................................17, 18

Wyle Inc. v. ITT Corp.,
    130 A.D.3d 438 (1st Dep't 2015) ...............................................................................................14

**Statutes**

17 U.S.C. § 301(a) ...........................................................................................................................18

28 U.S.C. § 1454................................................................................................................................3

CPLR 201.........................................................................................................................................22

CPLR 213(2).....................................................................................................................................22

**Other Authorities**

Federal Rules of Civil Procedure 8(a)(2) .......................................................................11

Federal Rules of Civil Procedure 9(b) ....................................................................12, 13

FRCP 12(b)(6) ........................................................................................................1, 11

22 N.Y. Jur. 2d Contracts § 59 (Nov. 2019 Update) .......................................................16

58 N.Y. Jur. 2d Evidence and Witnesses § 578 (Nov. 2019 Update) ............................16

### MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF
### PLAINTIFFS AND THIRD-PARTY DEFENDANT TO DISMISS
### DEFENDANTS' COUNTERCLAIMS AND THE THIRD-PARTY COMPLAINT

Plaintiffs Reach Global Inc. ("Reach Global"), Reach Music Publishing, Inc. ("Reach

Music", and, together with Reach Global, the "Reach Entities") and Terrordome Music

Publishing, LLC ("Terrordome") and Third-Party Defendant Michael Closter ("Closter")

respectfully submit this Memorandum of Law in support of their motion, pursuant to FRCP

12(b)(6), to dismiss the Counterclaims asserted by defendants Carlton Ridenhour ("Ridenhour")

and Bring the Noize Music, Inc. ("BTNM") and the Third-Party Complaint brought against

Closter.

The Plaintiff Reach Entities are music publishers owned by Closter.  Plaintiff Terrordome

is a New York limited liability company co-owned by Ridenhour's company, Defendant BTNM,

and Plaintiff Reach Global.  Plaintiff Reach Global is the Managing Member of Terrordome

### PRELIMINARY STATEMENT

This case arises out of several agreements relating to the ownership and administration of

certain copyrights of musical compositions co-written by Defendant and Third-Party Plaintiff

Ridenhour, one of the founding members of the hip-hop group known as Public Enemy.  Copies

of the relevant agreements can be found as Exhibits 1-6 to the accompanying Declaration of

Edward P. Grosz, dated February 7, 2020 ("Grosz Decl.").[1]  Most of the agreements contain New

---

[1]     It is well-established that a Court, on a motion to dismiss, may consider
documents outside the four corners of a pleading where such documents have been attached to or
relied heavily upon in the pleading.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152-153 (2d
Cir. 2002).  Where, as here, contracts or other legal documents containing obligations upon
which the pleading stands or falls may be considered on a 12(b)(6) motion even where they are
not attached to the pleading.  Global Network Communications, Inc. v. City of New York, 458

York choice of law provisions, and none explicitly incorporate the law of any other jurisdiction. See Grosz Decl., Ex. 1, ¶ 16; Ex. 2, ¶ 8; Ex. 3, § 13.4; Ex. 5, ¶ 3. The copyrights were ultimately assigned to Plaintiff Terrordome. See Grosz Decl., Exs. 1, 2, 6.

Plaintiffs commenced this action in the Supreme Court of the State of New York, New York County, on October 25, 2019. In their Complaint, Plaintiffs seek (1) a declaration that the agreements among the parties are valid; (2) a declaration that Plaintiffs' rights to the songs are valid and in full force and effect and that Defendants cannot seek rescission of the agreements; and (3) indemnification, including reasonable attorneys' fees and disbursements incurred by Terrordome, under two of the agreements among the parties, based upon Defendants' actions challenging the validity of those agreements and Plaintiffs' need to commence this action to vindicate their rights. A copy of Plaintiffs' Complaint is attached as Exhibit A to Plaintiffs' and Third-Party Defendant's Notice of Removal (ECF Doc. No. 1, Attachment No 1).

On December 16, 2019, Defendants filed an Answer, Defenses, Counterclaims and Third-Party Complaint against Closter (the "Answer"). In their Answer, Defendants assert four claims against Plaintiffs and Closter as follows: (1) conversion of "substantial ownership in many valuable copyrights owned by Plaintiffs and [of] over One Million Dollars in royalties received from exploitation" of the songs; (2) fraud; (3) a declaration that the agreements among the parties are "void and of no effect and all copyrights pertaining to the Ridenhour compositions should be restored to" Defendants; and (4) an accounting. A copy of Defendants' Answer is

---

F.3d 150, 156-157 (2d Cir. 2006). In this case, Defendants seek rescission of the "Terrordome Agreements," Answer ¶ 114, a term which is not defined in the Answer, but is defined in the Complaint. See Complaint, ¶¶ 21, 23, 25, 28, 20, 30, 32. Because the Terrordome Agreements, which are attached to the accompanying Grosz Declaration, are central to Defendants' claims herein, they may be considered by this Court on this motion to dismiss.

attached as Exhibit C to Plaintiff's and Third-Party Defendant's Notice of Removal (ECF Doc. No. 1, Attachment Nos. 6-7).[2]

On January 15, 2020, Plaintiffs and Third-Party Defendant timely removed this action to this Court pursuant to 28 U.S.C. § 1454, which provides that "A civil action in which any party asserts a claim for relief arising under any Act of Congress relating to . . . copyrights may be removed to the district court of the United States for the district and division embracing the place where the action is pending." Defendants have not challenged the removal of this action or moved to remand the action to State Court.

For over 15 years, the parties operated under their various agreements without any difficulties or disagreements. However, in 2019, Ridenhour, after receiving millions of dollars through the efforts of the Reach Parties to protect and monetize the copyrights, abruptly concluded that he had somehow been cheated, and sought rescission of the very contracts that he had been profiting from for so many years.

The central claims asserted by Defendants in their Counterclaims and Third-Party Complaint are found in the following paragraphs of their Answer, in which they allege as follows:

71.     Closter formed Terrordome as a means to hold ownership interests in, and gain total control of, Ridenhour's musical composition copyrights while misrepresenting to Ridenhour that Terrordome would simply administer publishing rights.

72.     Simultaneously, Closter formed BTNM, falsely telling Ridenhour that Closter would administer the copyright publishing interests owned by BTNM. Instead, Closter caused BTNM to assign its copyright interests to Terrordome thereby gaining a percentage interest for himself.

---

[2]     An additional copy of Defendants' Answer can also be found at Exhibit F to Plaintiffs' and Third-Party Defendants' Notice of Removal (ECF Doc. No. 1, Attachment Nos. 10-11).

-3-

     *                *                *

     77.     The next step in Closter's plan was the written agreement dated "made as of October 22, 2001," prepared by Closter, falsely represented by Closter to Ridenhour to be an agreement that would allow Terrordome to publish and administer BTNM's musical composition catalog. Although this purpose is stated in the opening paragraphs, in fact, the agreement provided that BTNM "irrevocably and absolutely assigns, conveys and sets over unto [Terrordome] . . . an undivided one-hundred (100%) percent interest in all worldwide right, title, interest and ownership of every nature, kind and description in and to [BTNM's] share of all songs commercially released prior to the date of this agreement. . ." and granted Terrordome "sole and exclusive administration rights. . ."

     *                *                *

     79.     Next, Closter caused an operating agreement for Terrordome (the "TOA") to be prepared and to become effective as of January 10, 2002. The TOA was entered into between BTNM, Reach Global and Knight Owl, a company owned by Ridenhour's then business manager, Walter Leapheart.

     80.     The TOA provided that Reach Global and Knight Owl would each contribute initial capital of only $500 (Five Hundred Dollars); that BTNM would contribute $500 plus its entire catalog of copyrights valued by Closter at $10,000 (Ten Thousand Dollars). . . Closter again falsely representing to Ridenhour that Terrordome was simply administering Ridenhour's musical compositions, subsequently had Ridenhour also individually assign all his interests in musical compositions to Terrordome in return for no additional ownership interest in Terrordome or other compensation.

Answer, ¶¶ 71-72, 77, 79-80.

     The problem with Defendants' claims is that, as Defendants readily acknowledge, the contracts Ridenhour signed, either individually or on behalf of BTNM, explicitly effectuated an assignment of Ridenhour's interest in the copyrights to Terrordome, and did not merely give Terrordome the right to administer the copyrights, as Defendants claim. Defendants do not and cannot claim that Plaintiffs or Closter acted in any way contrary to the explicit language of those contracts when they took steps to register the copyrights in Terrordome's name.

     Accordingly, Defendants' complaint in this action, in effect, is that they did not understand the contracts that they executed. However, it is axiomatic that parties are

conclusively presumed to have read any contract that they sign, and cannot complain later that the words in such contract did not comport with their understanding. Accordingly, Defendants' Second and Third Counterclaims and Second and Third Third-Party Caused of Action for fraud, rescission and declaratory relief, must be dismissed. Answer, ¶¶ 109-115.

Recognizing that they cannot possibly bring any claim for breach of contract or fraud, Defendants have concocted a claim for conversion of copyrights. Such a claim is unknown under New York law, and, in any event, would be preempted by the Copyright Act, even if such a claim existed. Accordingly, Defendants' First Counterclaim and First Third-Party Causes of Action for conversion, must also be dismissed. Answer, ¶¶ 105-108.

Finally, Defendants' Fourth Counterclaim and Fourth Third-Party Cause of Action (Answer, ¶¶ 116-118), seeking an accounting, should be dismissed to the extent that Defendants seek an accounting beyond the incontestability periods set forth in the relevant contracts,[3] to the extent royalty statements were issued to Defendants, or beyond the applicable six-year statute of limitations for breach of contract claims, to the extent royalty statements were not issued to Defendants.

### STATEMENT OF FACTS[4]

Third-Party Defendant Closter first became acquainted with Defendant Ridenhour during the mid-1990's, when Closter worked for Public Enemy co-founder Hank Shocklee and its business manager. In or about 2000, Closter recognized that Ridenhour was missing out on a large amount of revenue as the co-author of Public Enemy's musical compositions, as he had assigned all of his publishing copyrights to the record label, Def Jam (and its publishing affiliate

---

[3]    See Grosz Decl., Ex. 1, ¶ 6(ii); Ex. 4, ¶ 5(ii).
[4]    The material facts and factual allegations are set forth in Plaintiffs' Complaint and Defendants' Answer and are set forth herein in summary fashion

-5-

Def Jam Music, Inc.), pursuant to a 1986 recording agreement; and, although a 1992 agreement with Def Jam provided for the label to assign back 50% of the copyright ownership interests to BTNM (as well as the ability for BTNM to directly collect and "administer" its own share of income), these provisions had never been effectuated.

By this time in 2000, Ridenhour was a 40-year-old music industry veteran (9 years older than Closter), having signed his first record deal with Def Jam Records in 1986, and subsequently entering into a Recording Agreement amendment with Def Jam in 1992, a Publishing Agreement with Chrysalis Music in 1996, and a Termination Agreement with Def Jam in 1998, all with management and legal representation.

In or about 2001, Closter proposed to Ridenhour and his then-manager the following:  (i) Closter would work to effectuate and formalize Def Jam's assignment back to BTNM of its copyright ownership rights; (ii) those reclaimed rights would be transferred into and held by a publishing entity that would be formed and owned by Ridenhour's entity BTNM, his manager's entity, and Closter's entity; and (iii) Closter, through his wholly-owned entities, including plaintiff Reach Global, would monetize, protect and administer the copyrights going forward in exchange for a minority ownership interest in this publishing company as well as the right for the Reach Entities to exclusively administer Ridenhour's share of the copyrights.  Mr. Ridenhour and his manager agreed to the proposal.

In or about 2001, Closter assisted Ridenhour in forming BTNM.  Closter worked with Def Jam's successor, Universal Music Publishing, Inc. ("UMPG"), to have UMPG transfer to BTNM one-half of the publishing rights that Ridenhour had given up as part of his 1986 Def Jam recording agreement.  Closter then formed plaintiff Terrordome as the publishing entity that would own and represent those reclaimed publishing rights.  Under an agreement dated as of

October 22, 2001, BTNM assigned to Terrordome all of its music publishing copyrights that were obtained back from UMPG (the "2001 Publishing Agreement").

In a futile attempt to buttress their claim that the 2001 Publishing Agreement and the other relevant agreements, described more fully below, should be rescinded, Defendants make the disingenuous and bizarre claim that the 2001 Publishing Agreement was entered into "without any type of financial consideration." Answer, ¶¶ 61, 77, 115. However, the 2001 Publishing Agreement explicitly provides at the outset that the Agreement was being made "for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties." Grosz Decl., Ex. 1, p. 1. Moreover, the 2001 Publishing Agreement explicitly imposes certain obligations on Terrordome, including the obligation to pay 50% of the gross sums earned by exploitation of the copyrights to BTNM, after deducting certain expenses and fees, and the obligation to pay the writer's share of performance income to the composers and authors, including Ridenhour, without any deduction. Id., ¶ 4. The 2001 Publishing Agreement also imposes on Terrordome the obligation to "keep true and correct accounts, books and records" and to provide royalty statements to BTNM within 90 days of the end of each semi-annual accounting period ending December 31 and June 30. Id., ¶ 6. Such obligations are clearly sufficient consideration to support the enforceability of the 2001 Publishing Agreement.

By agreement dated October 23, 2001, Terrordome and Reach Global agreed that Reach Global would administer the publishing rights held by Terrordome, initially for no additional consideration (the "Administration Agreement"). Grosz Decl., Ex. 2. Defendant Ridenhour signed the Administration Agreement on behalf of Terrordome. Reach Global initially requested a 5% administration fee, but pursuant to comments from Ridenhour's manager and legal counsel, the administration fee was deleted. After Reach Global worked without any administration fee for over five years, Reach Global and Terrordome, in December of 2006, entered into an

-7-

amendment to the Administration Agreement, pursuant to which Reach Global began receiving a standard 10% administrative fee. Id., p. 8.

The ownership of Terrordome was established through a January 2002 Operating Agreement (the "Operating Agreement"). Grosz Decl., Ex. 3. The Operating Agreement went through three (3) redlined revised versions pursuant to comments from Ridenhour's manager and legal counsel, before an execution copy was prepared. The Operating Agreement established that the members of Terrordome were (i) BTNM (with a 50% interest); (ii) Reach Global (with a 34% interest); and (iii) Knight Owl Productions, Ltd. (with a 16% interest), an entity owned by Ridenhour's manager at the time. The Operating Agreement provided that Reach Global would be the Managing Member, with power to make all decisions concerning the business and affairs of Terrordome. Id., § 7.1(a).

In 2010, Ridenhour's manager asked to be bought out of his ownership interest in Terrordome, which Ridenhour and Closter jointly agreed to do and did through a written agreement (the "Purchase Agreement"), pursuant to which each bought out half of Knight Owl Productions, Ltd.'s interest. Grosz Decl., Ex. 5. Reach Global advanced all the costs to acquire Knight Owl's share. Accordingly, after this transaction, and to the present day, BTNM has a 58% interest in Terrordome and Reach Global a 42% interest. See Grosz Decl., Ex. 3, pp. 30-36.

Under an agreement dated as of April 25, 2002, Ridenhour assigned to Terrordome all of his music publishing copyrights in certain additional music compositions (the "2002 Publishing Agreement"). Grosz Decl., Ex. 4. As with the 2001 Publishing Agreement, the 2002 Publishing Agreement obliged Terrordome to pay 50% of all gross sums generated by the songs subject to the Agreement to Ridenhour, after deducting certain charges and fees, including a standard administration fee of 10%, and to account to Ridenhour for all royalties or other compensation

-8-

earned with respect to the songs, within 90 days after the end of each semi-annual period ending December 31 and June 30.  Id., ¶¶ 3, 5.

Under an agreement dated as of August 1, 2012 (the "Amendment Agreement"), the parties amended the 2001 Publishing Agreement, the 2002 Publishing Agreement and the Administration Agreement to provide that all songs written in whole or in part by Ridenhour through December 31, 2012 would be included in these three Agreements.  Grosz Decl., Ex. 6. The Amendment Agreement also provide that Reach Global would be the exclusive administrator of all copyrights assigned to Terrordome.  Id., ¶ 2.  The Amendment Agreement was executed by Defendant Ridenhour on behalf of himself, Defendant BTNM and Plaintiff Terrordome.  Id., p. 2.

Pursuant to an Assignment dated December 1, 2014, Reach Global assigned its administration rights under the Administration Agreement to Reach Music.

Through the Operating Agreement, 2001 Publishing Agreement, 2002 Publishing Agreement, Administration Agreement, the Purchase Agreement and the Amendment Agreement (collectively the "Terrordome Agreements"), Ridenhour and Closter established a successful and profitable publishing relationship.  The Reach Entities administer and protect the copyrights owned by Terrordome.  The Reach Entities account to the members of Terrordome, minus certain fees and costs that the Reach Entities are entitled to deduct.  The members of Terrordome – BTNM and Reach Global – share the proceeds in accordance with the Agreements and the formula set forth in the Operating Agreement.

Ridenhour and Closter and their respective entities have worked closely together since the Terrordome Agreements were executed nearly two decades ago, and the Terrordome publishing arrangements have been a considerable success and a source of substantial income for Ridenhour.  By virtue of Closter's successful efforts to obtain back Ridenhour's publishing rights