from Def Jam, and the Reach Entities' diligence, dedication and savvy in representing and

monetizing those rights, Ridenhour, directly or through his companies, has received millions of

dollars in income, with several hundreds of thousands of dollars further paid at Ridenhour's

request to cover his numerous bills and expenses.

Not once in the first 17 years following execution of the Terrordome Agreements did

Ridenhour complain to Closter that he was taken advantage of, or that he regretted assigning his

publishing rights into Terrordome, or that Reach Global unfairly obtained an interest in

Terrordome, or that the Reach Entities were receiving too large a share of the proceeds.

Ridenhour and Closter had a good friendship and shared camaraderie, both on a personal and

business level.  In fact, Ridenhour had always insisted that he did not need or want anyone

"managing" his music publisher, Reach Global.  And then out of left field, with a new

management team in tow, Ridenhour's representatives began asserting that Closter had

fraudulently induced the Terrordome Agreements, even though Ridenhour and BTNM were

represented by a manager and able, independent counsel in the deal-making.

## ARGUMENT

### I.

### THIS COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS DEFENDANTS' SECOND AND THIRD COUNTERCLAIMS AND THIRD-PARTY CAUSES OF ACTION FOR FRAUD, DECLARATORY RELIEF AND RESCISSION

To survive a motion to dismiss, a complaint must contain sufficient factual material,

accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. Id.  "A claim is

-10-

plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Savage v. Galaxy Media & Mktg. Corp., 526 F. App'x 102, 103–04 (2d Cir. 2013). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Twombly, 550 U.S. at 555; Savage, 526 F. App'x at 104 (citing Iqbal, 556 U.S. at 678) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). While Federal Rules of Civil Procedure 8(a)(2) provides that a pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," thereby departing significantly from the hyper-technical pleading requirements of a prior era, it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Iqbal, 556 U.S. at 678-679.

In considering whether a complaint states a claim upon which relief can be granted, the Court may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth, and then determine whether the remaining well-pleaded factual allegations, accepted as true, plausibly give rise to an entitlement to relief. Id. Deciding whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has merely alleged, but has not, as required by Rule 8(a)(2), "show[n] that the pleader is entitled to relief." Id.

Where, as here, a party brings a cause of action for fraud, Federal Rules of Civil Procedure 9(b) imposes a heightened pleading standard. Specifically, a party "must state with particularity the circumstances constituting fraud," but may allege "generally" the conditions of a person's mind. Rule 9(b) requires that the complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993). Allegations of false representations must be attributed to specific defendants, and a claimant must allege facts that give rise to a strong inference of fraudulent intent. Rodriguez v. It's Just Lunch, Int'l, 2010 WL 685009, at *5 (S.D.N.Y. Feb. 23, 2010). The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

In order to sustain a claim for fraud, the complaint must allege "a misrepresentation or a material omission of fact which was false and known to be false . . . made for the purpose of inducing the other party to rely upon it, justifiable reliance on the other party on the misrepresentation or material omission, and injury." FNF Touring LLC, v. Transform America Corp., 111 A.D.3d 401, 401-402 (1st Dep't 2013).

Here, Defendants have failed to satisfy any of the critical elements to a properly pled fraud claim. Defendants rely on nothing more than speculation with no particularization as to

how Plaintiffs or Closter committed a purported fraud.  Defendants have, accordingly, failed to satisfy the pleading requirements of the Federal Rules of Civil Procedure.[5]

***First,*** Defendants have failed to identify any specific statements made by Plaintiffs or Closter which Defendants claim were fraudulent.  All that Defendants have done is make vague allegations that Plaintiffs and Closter purportedly made certain representations concerning the contracts signed by Defendants.  Not only is this insufficient under Rule 9(b), but Defendants have failed to make any specific allegations concerning the time and the place the purportedly fraudulent statements were made, or anything else about the circumstances under which the statements were made.

***Second,*** even if the Answer identified with the requisite specificity any false statements made by any Plaintiffs or Closter, Defendants' fraud claim would be precluded by the integration clauses contained in most of the Terrordome Agreements.  <u>See</u> Grosz Decl., Ex. 1, ¶ 11; Ex. 2, ¶ 10; Ex. 3, § 13.7; Ex. 4, ¶ 7.

***Third,*** Defendants make only conclusory allegations that Plaintiffs and Closter acted with improper scienter with respect to the contracts at issue in this case.  Such conclusory allegations are insufficient to establish improper scienter.

***Fourth,*** Defendants do not make any allegations from which an inference can be drawn that any of the statements made by Plaintiffs or Closter were false.

***Fifth,*** as a matter of law, Defendants cannot state a claim for fraud where, as here, the purported fraud is contradicted by the terms of the Terrordome Agreements.  Defendants claim

---

[5]       Defendants' Third Counterclaim and Third Third-Party Cause of Action merely restates their claims for fraud and conversion in support of their claim for rescission and declaratory relief.  Answer, ¶¶ 113-115.  Accordingly, to the extent Defendants' fraud claim should be dismissed, Defendants' Third Counterclaim and Third Third-Party Cause of Action should also be dismissed.

that they believed that Terrordome was merely set up to administer Ridenhour's copyrights and were not aware that the copyrights were being assigned to Terrordome.  However, a party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a document on the ground that he or she did not read it or know its contents. Cash v. Titan Fin. Servs., 58 A.D.3d 785, 788 (2d Dep't 2009).  As a general rule, a party is conclusively bound by the terms of a contract, even if they failed to read it before signing. Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 11 (1988).  Only where the signer is illiterate, blind or ignorant of the alien language of the writing, and the contents thereof  are misread or misinterpreted to him by the other party, or even a stranger, and is not negligent, can a party be excused from being bound by the terms of a contract he signed.  Pimpinello v. Swift & Co., 253 N.Y. 159, 162-164 (1930).

In this case, Defendants do not allege any facts which would excuse them from being bound by the explicit terms of the Terrordome Agreements.  They simply allege that they did not understand the terms contained in those Agreements.  Because a contract cannot be voided for under such circumstances, Defendants Counterclaim and Third-Party Cause of Action for fraud should be dismissed.

Defendants' Counterclaims and Third-Party Causes of Action are not bolstered by their conclusory and unsupported allegation that Terrordome "never actually engaged in business and was set up by Closter for a fraudulent purpose."  Answer, ¶ 114.  At most, this is an allegation that Terrordome never intended to comply with any contractual obligations it had to Defendants. However, general allegations that a defendant entered into a contract while lacking the intent to perform it are insufficient to support a claim for fraud.  New York University v. Continental Ins. Co., 87 N.Y.2d 308, 318 (1995); Wyle Inc. v. ITT Corp., 130 A.D.3d 438 (1st Dep't 2015); R.A. Assocs. v. Lerner, 265 A.D.2d 541, 542 (2d Dep't 1999); Gupta Realty Corp. v. Gross, 251

A.D.2d 544 (2d Dep't 1998); <u>Alamo Contract Builders, Inc. v. CTF Hotel Co.</u>, 242 A.D.2d 643, 643-644 (2d Dep't 1997) (no fraud claim where the alleged misrepresentations relate to a specific provision of the contract); <u>Metropolitan Trans. Auth. v. Triumph Advertising Productions, Inc.</u>, 116 A.D.2d 526, 527-528 (1st Dep't 1986); <u>Comtomark, Inc. v. Satellite Communications Network, Inc.</u>, 116 A.D.2d 499, 500-501 (1st Dep't 1986).

In order to allege a viable claim of fraud concerning a contract, a party must allege misrepresentations of present facts (rather than merely future intent) that are collateral to the contract and which induced the allegedly defrauded party to enter in to the contract.  <u>Orix Credit Alliance, Inc. v. R.E. Hable Co.</u>, 256 A.D.2d 114, 115-116 (1st Dep't 1998) (fraud claim dismissed where the purported misrepresentation was directly related to the provision of the contract and could not have been more central to the purpose of the contract); <u>Noufrios v. Murat</u>, 193 A.D.2d 791, 792 (2d Dep't 1993).  A failure to perform promises of future acts is merely a breach of contract to be enforced by an action on the contract, and cannot give rise to a fraud claim.  <u>Tesoro Petroleum v. Holborn Oil Co.</u>, 108 A.D.2d 607 (1st Dep't 1985).

In this case, Defendants allege nothing more against Terrordome than that it never intended to perform the commercial activities that it contractually agreed to perform.  Even if true, this would state nothing more than a breach of contract claim.  Accordingly, any claim of fraud arising out of Terrordome's purported misconduct should be dismissed.

Defendants' Counterclaims and Third-Party Causes of Action are also not bolstered by their disingenuous and bizarre claim that the 2001 Publishing Agreement and the other Terrordome Agreements were entered into "without any type of financial consideration."  Answer, ¶¶ 61, 77, 115.  As an initial matter, the 2001 Publishing Agreement explicitly provides at the outset that the Agreement was being made "for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties."  It is well-established

-15-

under New York law that such a recital creates a presumption of consideration for the writing or an admission by the party executing the contract of sufficient consideration. 22 N.Y. Jur. 2d Contracts § 59 (Nov. 2019 Update); 58 N.Y. Jur. 2d Evidence and Witnesses § 578 (Nov. 2019 Update). To overcome the presumption, the party claiming lack of consideration must come forth with evidence to substantiate that claim. Ehrlich v. American Moninger Greenhouse Mfg. Corp, 26 N.Y.2d 255, 258-259 (1970); Carrara v Carrara, 29 Misc. 2d 907, 908-909 (Westchester Cty. 1961), aff'd, 16 A.D.2d 695 (2d Dep't 1962). In this case, not only does the explicit language of the 2001 Publishing Agreement demonstrate that consideration was provided by Terrordome, Defendants have admitted in their Answer that Ridenhour received payment from the Reach Entities from the exploitation of the copyrights. Answer, ¶ 83 ("Reach Global and Reach Music have deposited various sums to bank accounts owned or controlled by Ridenhour.").

Moreover, the 2001 Publishing Agreement explicitly imposes certain obligations on Terrordome, including the obligation to pay 50% of the gross sums earned by exploitation of the copyrights to BTNM, after deducting certain expenses and fees, and the obligation to pay the writer's share of performance income to the composers and authors, including Ridenhour, without any deduction. Grosz Decl., Ex. 1, ¶ 4. The 2001 Publishing Agreement also imposes on Terrordome the obligation to "keep true and correct accounts, books and records" and to provide royalty statements to BTNM within 90 days of the end of each semi-annual accounting period ending December 31 and June 30. Id., ¶ 6. Such obligations are clearly sufficient consideration to support the enforceability of the 2001 Publishing Agreement.

Defendants may argue that, since the 2001 Publishing Agreement does not explicitly require Terrordome to use any efforts to market the songs, there is no consideration flowing from Terrordome to BTNM. A similar argument, of course, was rejected by the New York State

Court of Appeals in Judge Cardozo's famous decision rendered in <u>Wood v. Lucy, Lady Duff-Gordon</u>, 222 N.Y. 88 (1917). In that case, plaintiff Otis F. Wood sued Lucy, Lady Duff-Gordon for violating an agreement whereby Duff-Gordon granted Wood the exclusive right to place her indorsements on the fashion designs of others and to place her own designs on sale. Duff-Gordon claimed that the agreement lacked consideration because Wood did not bind himself to undertake any efforts to sell her designs or find products for her indorsement. Judge Cardozo rejected Duff-Gordon's argument, with the following oft-quoted language:

> We think, however, that such a promise is fairly to be implied.
> The law has outgrown its primitive stage of formalism when the
> precise word was the sovereign talisman, and every slip was fatal.
> It takes a broader view today. A promise may be lacking, and yet
> the whole writing may be 'instinct with an obligation,' imperfectly
> expressed.

<u>Id.</u>, at 91. The Court of Appeals then proceeded to identify many terms in the agreement that supported the conclusion that Wood undertook an obligation to "use reasonable efforts to bring profits and revenues into existence." <u>Id.</u>, at 92. Many terms similar to those identified by the Court in <u>Duff-Gordon</u> are present in the 2001Publishing Agreement. Similar to <u>Duff-Gordon</u>, the 2001 Publishing Agreement contains a recital stating that Terrordome is "engaged in the music publishing business," implying that Terrordome, under management of Reach Global, would use its skills for the purpose of promoting the songs protected by the assigned copyrights. As in <u>Duff-Gordon</u>, the 2001 Publishing Agreement provides that BTNM's sole compensation would be a share of the royalties collected by Terrordome. Finally, as in <u>Duff-Gordon,</u> the 2001 Publishing Agreement provides that Terrordome is obliged to account for monies received by it. Thus, as in <u>Duff-Gordon,</u> the 2001 Publishing Agreement imposes on Terrordome the implied obligation of using reasonable efforts to "bring profits and revenues into existence," and, as in

Duff-Gordon, such an implied promise constitutes sufficient consideration to support the existence of a contract among the parties to the Terrordome Agreements.

Duff-Gordon has repeatedly been followed by courts in this Circuit. See, e.g., Automated Irrigation Controls, LLC v. The Watt Stopper, Inc., 407 F. Supp. 3d 274, 289-290 (S.D.N.Y. 2019); New Paradigm Software Corp. v. New Era of Networks, Inc., 2002 WL 31749396 at **11-14 (S.D.N.Y. Dec. 9, 2002); G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Co., 870 F. Supp. 472, 476 (E.D.N.Y. 1994); Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodservice Co., 730 F. Supp. 1209, 1219 (E.D.N.Y. 1990); Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154, 1157-1159 (S.D.N.Y. 1988); Driver Harris Co. v. Industrial Furnace Corp., 12 F. Supp. 918, 919 (W.D.N.Y. 1935).

For the foregoing reasons, Defendants' fraud claims should be dismissed in their entirety.

II.

### DEFENDANTS' STATE LAW CONVERSION CLAIM SHOULD BE DISMISSED AS PREEMPTED BY THE UNITED STATES COPYRIGHT ACT

In Defendants' First Counterclaim and First Third-Party Cause of Action, Defendants assert that they have a copyright interest in certain musical compositions co-authored by Defendant Ridenhour.[6]  Defendants further allege that Plaintiffs and Closter have acquired ownership of those copyrights through an act of conversion.  Answer, ¶¶ 105-108.  Because such a state law claim protects rights that are equivalent to those protected by the Copyright Act – including the exclusive right to reproduce the copyrighted works in copies and to prepare derivative works – it is preempted by the Copyright Act.  17 U.S.C. § 301(a).[7]  See, e.g., Harper

---

[6]     To the extent Defendants' Third Counterclaim and Third Third-Party Cause of Action restates their claim for conversion in support of their claim for rescission and declaratory relief, it should be dismissed for the same reasons set forth herein.  Answer, ¶¶ 113-115.

[7]     17 U.S.C. § 301(a) provides as follows:

& Row, Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 199-201 (2d Cir. 1983), reversed on other grounds, 471 U.S. 539 (1985); Miller v. Holtzbrinck Publishers, L.L.C., 377 F. App'x 72, 73-73 (2d Cir. 2010); New London Assocs., LLC v. Kinetic Soc. LL, 384 F. Supp. 3d 392, 411-412 (S.D.N.Y. 2019); Avalos v. IAC/Interactivecorp, 2014 WL 5493242 at **6-7 (S.D.N.Y. Oct. 30, 2014); Ardis Health, LLC v. Nankivell, 2012 WL 5290326 at **7-9 (S.D.N.Y. Oct. 23, 2012); Drum Major Music Entertainment Inc. v. Young Money Entertainment, LLC, 2012 WL 423350 at **4-5 (S.D.N.Y. Feb. 7, 2012); Gary Friedrich Enters., LLC v. Marvel Enters., Inc., 713 F. Supp. 2d 215, 230-231 (S.D.N.Y. 2010); Miller v. Holtzbrinck Publishers, LLC, 2008 WL 4891212 at *3 (S.D.N.Y. Nov. 11, 2008); Sun Micro Med. Techs. Corp. v. Passport Health Communications, Inc., 2006 WL 3500702 at **11-12 (S.D.N.Y. Dec. 4, 2006); Stewart v. World Wrestling Fed'n Entertainment, Inc., 2005 WL 66890 at **2-6 (S.D.N.Y. Jan. 11, 2005); Patrick v. Francis, 887 F. Supp. 481, 483-484 (W.D.N.Y. 1995); Strauss v. The Hearst Corp., 1988 WL 18932 at **7-8 (S.D.N.Y. Feb. 19, 1988); Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1534-1535 (S.D.N.Y. 1985); Uncle Jam Records & Tape Int'l, Inc. v. Warner Bros. Records, Inc., 1983 WL 1144 at **1-2 (S.D.N.Y. Sept. 23, 1983). See also 1 Nimmer on Copyright § 1.15[1][2] (2019).

Even if Defendants' conversion claim was not preempted by the Copyright Act, dismissal of that claim would be appropriate since New York law does not generally recognize a cause of action for conversion of intangible property. Conversion of intangible rights is limited under

---

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . and come within the subject matter of copyright . . . whether created before of after that date and whether published or unpublished, are governed by this title. Thereafter, no person is entitled to any such right or equivalent right in any work under the common law or statutes of any State.

New York law to those intangible property rights customarily merged in, or identified with, some

document.  Phansalkar v. Andersen Weinroth & Co., 175 F. Supp. 2d 635, 639-640 (S.D.N.Y.

2001); Ippolito v. Lennon, 150 A.D.2d 300, 302-303 (1st Dep't 1989) (citing Sporn v. MCA

Records, 58 N.Y.2d 482, 489 (1983); Restatement (Second) of Torts § 242; Prosser and Keeton

on Torts, 92-92 (1984)).  In any event, a cause of action for conversion is governed by a three-

year statute of limitations, which runs from the date of the alleged theft, even if the property

owner was unaware of the theft at the time that it occurred.  Lennon v. Seaman, 63 F. Supp. 2d

428, 439-440 (S.D.N.Y. 1999).  Here, the copyrights at issue were assigned to Terrordome in

2001 (Grosz Decl., Ex. 1), 2002 (Grosz Decl., Ex. 2) and 2012 (Grosz Decl., Ex. 6), well over

three years prior to the commencement of this action.

Accordingly, Defendants' copyright conversion claim must be dismissed on state law

grounds as well as pursuant to the Copyright Act.

Defendants' claim of conversion of royalty payments must also be dismissed.  Answer, ¶

106.  Any obligation to pay Defendants royalty proceeds arose out of the contractual relationship

among the parties under the Terrordome Agreements.  It is a well-established principle of New

York law that a simple breach of contract is not to be considered a tort unless a legal duty

independent of the contract itself has been violated.  This legal duty must spring from

circumstances extraneous to and not constituting elements of, the contract.  Clark Fitzpatrick,

Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 389 (1987).  For this reason, the law is clear

that an action for conversion cannot be validly maintained where damages are merely sought for

breach of contract.  Kopel v. Bandwidth Tech. Corp., 56 A.D.3d 320 (1st Dep't 2008); Peters

Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D. 2d 883, 884 (1st Dep't 1982); Raske v. Next

Management, LLC, 2013 WL 5033149 at *10 (N.Y. Sup. Sept. 12, 2013).  Where, as here, a

party has failed to allege any facts independent of the contract terms sufficient to give rise to a

-20-

claim for conversion, the conversion claim should be dismissed.  Jeffers v. American Univ. of

Antigua, 125 A.D.3d 440, 443 (1st Dep't 2015); Fesseha v. TD Waterhouse Investors Servs. Inc.,

305 A.D.2d 268, 269 (1st Dep't 2003).

In this case, any failure by Plaintiffs to pay royalties to Defendants would, at most, have

been a breach of contract.  Accordingly, no claim for conversion can lie with respect to any

unpaid royalties.

Further, in cases involving alleged conversion of money, a plaintiff must identify

'specified funds' that he/she entrusted to a defendant's custody only for a particular purpose.

Steven J. Kaye Assoc. v. Law Offices of Mitchell N. Kay, 2012 WL 123564 (Sup. Ct. N.Y. Co.

Jan. 9, 2012) (citing Thys v. Fortis, 74 A.D.3d 546 (1st Dep't 2010)).  In this case, Defendants

did not "entrust" any funds to the Plaintiffs or Third-Party Defendant – at most, they claim that

Plaintiffs should have paid them money pursuant to the various Terrordome Agreements.

Because there was never any identifiable fund of royalty proceeds, there could not have been a

conversion of such proceeds, and, accordingly, the First Counterclaim and First Third-Party

Cause of Action should be dismissed to the extent they allege conversion of such proceeds.

Defendants' First Counterclaim and First Third-Party Cause of Action does not state a

cause of action for conversion, and should be dismissed in its entirety.

### III.

**DEFENDANTS' FOURTH COUNTERCLAIM AND FOURTH THIRD-PARTY CAUSE
OF ACTION FOR AN ACCOUNTING SHOULD BE DISMISSED
TO THE EXTENT DEFENDANTS SEEK AN ACCOUNTING BEYOND THE TIME
PERIODS SET FORTH IN THE INCONTESTIBILITY PROVISIONS OF THE 2001
PUBLISHING AGREEMENT AND THE 2002 PUBLISHING AGREEMENT OR, TO
THE EXTENT ROYALTY STATEMENTS WERE NOT PROVIDED, FOR ANY
PERIOD EXCEEDING SIX YEARS BEFORE THE START OF THIS LITIGATION**

Although Defendants admit that Ridenhour was paid royalties by Plaintiffs in connection

with the copyrights assigned to Terrordome (Answer, ¶ 83), Defendants falsely claim that

Plaintiffs did not provide any accounting for those royalties. To the extent accounting statements were provided to Defendants, under both the 2001 Publishing Agreement and the 2002 Publishing Agreement, those accounting statements became final within two years, in the case of the 2001 Agreement, and within one year in the case of the 2002 Agreement. Grosz Decl., Ex. 1, ¶ 6(ii); Ex. 4, ¶ 5(ii). .

Under New York law, the statute of limitations for a breach of contract action is six years. CPLR 213(2). Thus, to the extent Defendants are claiming that the Reach Entities failed to account to Defendants in accordance with the provisions of the 2001 Publishing Agreement and the 2002 Publishing Agreement, such claims are precluded to the extent Plaintiffs seek an accounting for more than six years prior to the start of this litigation.

Pursuant to CPLR 201, parties to a contract may prescribe a shorter time by written agreement. Both the 2001 Publishing Agreement and the 2002 Publishing Agreement contain provisions shortening the period within which Defendants could challenge any accounting statement rendered by the Reach Entities. Thus, the 2001 Publishing Agreement provides as follows:

> Publisher [i.e., Reach Global, by assignment from Terrordome, and, later, Reach Music] shall keep true and correct accounts, books and records. Royalty statements and payments made by Publisher to [BTNM] shall be made within ninety (90) days after the end of each semi-annual accounting period ending December 31st and June 30th. . . .
>
> Each accounting and payment, in the absence of written objection thereto, shall become final within two (2) years of the rendering of each such royalty statement. . . . [BTNM] shall be foreclosed from maintaining any action, claim or proceeding relating to any accounting rendered hereunder unless it is commenced against Publisher in a court of competent jurisdiction within two (2) years after the date [BTNM] has delivered its written objection to Publisher hereunder.

Grosz Decl., Ex. 1, ¶¶ 6(i)-(ii).

Similarly, the 2002 Publishing Agreement provides as follows:

> Publisher shall keep true and correct accounts, books and records.  Royalty statements and payments made by Publisher to [Ridenhour] shall be made within ninety (90) days after the end of each semi-annual accounting period ending December 31st and June 30th.
>
> Each accounting and payment, in the absence of a written objection thereto, shall become final within one (1) year of the rendering of each such royalty statement.

Grosz Decl., Ex. 4, ¶¶ 5(i)-(ii).

New York courts routinely uphold the enforceability of contractual incontestability periods.  See Allman v. UMG Recordings, 530 F. Supp. 2d 602, 605-606 (S.D.N.Y. 2006) (collecting New York cases).  Absent proof that the contract is one of adhesion or the product of overreaching, duress, fraud or misrepresentation in regard to the agreement to the shortened period, or that the altered period is unreasonably short, short clauses are routinely upheld.  In the Matter of Incorporated Village of Saltaire v. Zagata, 280 A.D.2d 547, 547-548 (2d Dep't 2001). Failure to comply with a contractual limitation period will subject the action to dismissal.  Toto, Inc. v. Sony Music Entertainment, 2012 WL 6136365 (S.D.N.Y. Dec. 11, 2012), report and recommendation adopted, 2013 WL 163826 (S.D.N.Y Jan. 15, 2013).  A one-year contractual provision for challenging a royalty payment or statements has been upheld as reasonable by courts in this State.  Drum Major Music Entertainment Inc. v. Your Money Entertainment, LLC, 2012 WL 423350, *2 (S.D.N.Y. Feb. 7, 2012).

In this case, Defendants do not and cannot claim that the contractual limitation periods set forth in the 2001 Publishing Agreement and the 2002 Publishing Agreement were inserted in those Agreements through any overreaching or fraud by Plaintiffs and/or Closter.  Accordingly, to the extent any royalty statements were provided to Defendants more than two years before the commencement of the litigation (under the 2001 Agreement) or one year before the commencement of the litigation (under the 2002 Agreement), Defendants have no right to an accounting at this time.  To the extent accounting statements were not rendered – and the

evidence will show accounting statements were timely rendered to Defendants – Defendants are

entitled, at most, to an accounting for the last six years prior to the commencement of the

litigation.  To the extent Defendants are seeking an accounting beyond these time parameters,

Defendants' Fourth Counterclaim and Fourth Third-Party Cause of Action should be dismissed.

## CONCLUSION

For the foregoing reasons, the motion of Plaintiffs and Third-Party Defendant Michael

Closter to dismiss Defendants' Counterclaims and the Third-Party Complaint should be granted.

Dated: New York, New York
       February 7, 2020

**REITLER KAILAS & ROSENBLATT LLC**

By: _____

Brian D. Caplan
Paul V. LiCalsi
Edward P. Grosz
885 Third Avenue
New York, New York 10022
(212) 209-3050
*Attorneys for Plaintiffs*
*Reach Global Inc., Reach Music*
*Publishing, Inc. and Terrordome Music*
*Publishing, LLC and Third-Party*
*Defendant Michael Closter*

- and -

**KINSELLA WEITZMAN ISER KUMP &**
**ALDISERT LLP**
Lawrence Y. Iser
Gregory P. Korn
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel. (310) 566-9800
*Attorneys for Plaintiffs Reach Global Inc., Reach Music*
*Publishing, Inc. and Terrordome Music Publishing, LLC*
*and Third-Party Defendant Michael Closter*

-24-